**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **PLATINUM HEIGHTS, LP,**[1] | § | Case No. 25-90012 (ARP) |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S SECOND AMENDED MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING THE DEBTOR TO SURCHARGE CERTAIN COLLATERAL,**
**(II) DIRECTING THE SECURED LENDER TO PAY THE SURCHARGED AMOUNTS,**
**(III) SETTING THE AMOUNT OF THE SECURED LENDER'S CREDIT BID AT AN**
**AUCTION, AND (IV) GRANTING RELATED RELIEF**

A HEARING WILL BE CONDUCTED ON THIS MATTER ON OCTOBER 27, 2025, AT 9:00 A.M. (CENTRAL TIME). IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ ON OR BEFORE OCTOBER 24, 2025. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION. AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE PEREZ'S CONFERENCE ROOM NUMBER IS 282694. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE PEREZ'S HOME PAGE. THE MEETING CODE IS "JUDGEPEREZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.

HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE PEREZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.

---

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is Platinum Heights, LP (4367). The location of the Debtor's corporate headquarters and the Debtor's service address is: 1917 Ashland Street, Houston, Texas 77008.

Platinum Heights LP, as debtor and debtor in possession in the above-captioned chapter 11 case (the "***Debtor***"), respectfully represents as follows in support of this second amended and restated motion[2] (the "***Amended Motion***"):

## I.     Summary of Relief Requested[3]

1.      The Debtor has incurred expenses of at least $1,477,629.97 in preserving or improving the Secured Lender's collateral that fall squarely within the § 506(c) surcharge statute. However, the Secured Lender seeks to leverage credit bid rights to (i) avoid the surcharge, and (ii) grab value under the Plan for unsecured creditors that is not contributed on account of property subject to the Secured Lender's lien. Accordingly, the Debtor requests an order from the Court:

> (a) finding that the Debtor incurred at least $1,477,629.97 in expenses that were reasonable, necessary, and beneficial to preserving property that is subject to the Secured Lender's lien (the "***Expenses***");
>
> (b) permitting the Debtor to surcharge the Expenses against the Secured Lender under § 506(c) of the Bankruptcy Code;
>
> (c) setting the maximum amount that the Secured Lender may credit bid under § 363(k) at the Auction at $16,551,088.00; and
>
> (d) ordering that: (i) the Secured Lender deliver $1,477,629.97 to the Debtor as a condition of submitting a credit bid at the Auction, or (ii) if the Secured Lender does not submit a credit bid at the Auction, the Plan Sponsor deliver $1,477,629.97 of the distribution owed to the Secured Lener under the Plan to the Plan Administrator on the Effective Date (as those terms are defined in the Plan).

## II.     Background

### A.     Mounting Pre-Bankruptcy Pressures on the Secured Lender's Collateral

2.      The Debtor filed chapter 11 in late February 2025 on the verge of a receiver appointment and with only one tenant paying approximately $69,000 monthly—compared to the Debtor's monthly operational expenses of over $100,00 and $190,000 monthly in debt service. *See*

---

[2] The first motion was filed at docket number 128. The first amened motion was filed at docket number 143.

[3] Capitalized terms not defined in the following "Summary of Relief Requested" are defined below.

Ex. 1 (Proposed Order Appointing Receiver).[4]

3.      The Debtor's loss of rental revenue following its main tenant's 2024 operational cessation resulted in the Debtor's inability to address various operational issues with the Hospital[5] that is subject to the Secured Lender's lien. For example, the Debtor could not afford to pay contractual obligations to service and repair five non-functioning elevators (only one functioning).

4.      The Debtor could not afford insurance—causing the Secured Lender to obtain "forced placed insurance." The City of Houston City had sued the Debtor related to testing for a legionella bacteria outbreak in 2022 and therefore was subject to testing protocol costs.[6]

**B.      Remarkable Efforts During the Chapter 11 Case**

> i.      Avoiding Potential Loss of Control over the Hospital

5.      The Debtor and its professionals expended substantial effort during this case to preserve the Secured Lender's collateral (i.e., the Hospital). The chapter 11 filing did not deter CLS Heights (the Debtor's limited partner) in continuing litigation. The Debtor believes that CLS was likely to file a lift stay motion or a motion to dismiss the chapter 11 case to continue its efforts for appointment of a receiver.

6.      The Debtor's professionals worked quickly to open an information channel with CLS's counsel and explore creative solutions to effectuate a litigation standstill. The Debtor agreed to appoint Erik White as the CRO, which avoided a possible loss of control over the Hospital— the Secured Lender's main collateral—to a receiver.

---

[4] The state court held evidentiary hearings on CLS's application for appointment of a receiver on February 11 and 14, 2025.

[5] The "***Hospital***" is the Heights Hospital that is located at 1917 Ashland Street, Houston, Texas 77008.

[6] During the chapter 11 case, the Debtor diligently worked with the City of Houston and with its vendor assisting with the legionella testing to maintain compliance with a testing protocol.

ii.   <u>Reviving a Second Paying Tenant</u>

7.      Prior to the chapter 11, the Debtor signed a lease with Ashland Healthcare to occupy two floors in the Hospital, including an Emergency Room. Ashland Healthcare was formed as a joint venture between the Omni Group and an entity controlled by Dr. Baig. Under the JV, Omni had full operational control of Ashland and negotiated the March 1, 2025 lease with the Debtor.[7]

8.      Ashland was not required to pay rent until it was fully operational, including having access to three working elevators. Five of the Hospital's six elevator were not functioning, and Amtech Elevator Services ("***Amtech***") refused repair work absent payment of past due prepetition amounts the Debtor could not afford. The Debtor's professionals immediately negotiated with Amtech's in-house and outside counsel and leveraged the Bankruptcy Code's tools to convince Amtech to recommence work without current payment.

9.      With the elevator work under control, Ashland continued moving into the Hospital in the Spring of 2025. However, Omni delayed opening Ashland's operations, which delayed its obligations to pay rent. Eventually, Omni withdrew from the JV and abandoned operations in early May 2025. The Debtor's principal—Dr. Baig—sprung into action to resuscitate Ashland, working with providers and other related professionals to move their practice into the Hospital.

10.      The Debtor's CRO requested that Dr. Baig fund a DIP loan to cover the shortfall from Ashland's inability to pay budgeted rent to avoid administrative insolvency. On three separate occasions, Dr. Baig agreed to fund DIP loans (totaling $605,000), which preserved the value of the Secured Lender's collateral and avoided the Hospital's shutdown.

---

[7] The Debtor signed the lease with Ashland Healthcare prior to the chapter 11. March 1, 2025 was the lease effective date.

11.     Dr. Baig's, the CRO's, the Debtor's employees', and the Debtor's professionals' hard work to revive Ashland Healthcare were successful. Ashland Healthcare began paying its monthly rent of approximately $275,000 in July 2025.

### iii.     Other Post-Petition Operational Issues

12.     Various operational issues during this case forced "whack-a-mole" attention from the Debtor and its professionals. For example, the Debtor's HVAC owner threatened to remove the Hospital's "chiller" for pre-petition past due amounts, which would have shut down the Hospital. The Debtor's lease agreement is with an intermediary, which complicated the Debtor's options.[8]

13.     The Debtor's vendor, ChemAqua, also threatened to discontinue services because of past-due amounts. ChemAqua is the only vendor able to perform the water testing necessary for the Debtor's protocol compliance with the City of Houston related to the legionella testing.

14.     The Debtor spent significant time and effort on plumbing and HVAC repairs which directly benefited the Secured Lender. The Debtor's repairs included replacing and fixing domestic water pumps to address issues with water pressure on certain floors of the Hospital, fixing a leak that impacted the Hospital floor leased to PAM Healthcare, replacing sump pumps and remediating flooding in the basement of the Hospital, and retaining vendor Facilities Mechanical to troubleshoot the Hospital's pneumatic system.

15.     The Debtor's consistently paying tenant, PAM Healthcare, raised numerous operational compliance issues during the chapter 11 case. The Debtor and its professionals have spent significant time addressing PAM Healthcare's concerns to avoid threats of PAM Healthcare taking action to terminate the lease—which is also the Secured Lender's collateral. *See* Dkt. No.

---

[8] A chiller is a large scale cooling system used to regulate temperature in the Hospital. The Hospital's chiller is located externally—increasing the concern of the owner's repossession.

161 at 13 ("In addition to the various building system reports, PAM Health also raised a host of concerns to the Debtor about various building issues (i.e., elevator malfunctioning, HVAC issues, etc.) that PAM Health believed needed to be addressed immediately—the absence of which could create safety concerns.").

        iv.    The Plan Sponsor's Arrival

16.      Thomas McMahon (the "***Plan Sponsor***") approached the Debtor in late May 2025 to explore a potential transaction that ultimately resulted in the Debtor's current chapter 11 plan (the "***Plan***"). *See* Dkt. 159. Under the Plan, the Plan Sponsor pays the Secured Lender $16–$16.7 million—even though the Secured Lender's core collateral is valued at $12.5 million.[9] The Plan also pays trade creditors 25%, pays administrative expenses and priority taxes in full, and funds a winddown trust.

17.      This extraordinary result would not have occurred without the Debtor's, Dr. Baig's, the Debtor's employees', and the Debtor's professionals' tireless work to preserve and improve the value of the Secured Lender's collateral.

**C.    The Secured Lender's Lien and Collateral**

18.      The Debtor's Property[10] is encumbered by a Deed of Trust (with Security Agreement and Assignment of Rents), dated as of September 29, 2022 (the "***Deed of Trust***"), to secure repayment of a promissory note (the "***Note***") dated September 28, 2022, in the amount of $29,000,000.00 by the Debtor in favor of b1 Bank (the "***Secured Lender***"). Under § 4.2 of the Deed of Trust, the Debtor also provided an assignment of its rental income. The Secured Ledner alleges that the total Note principal amount was $27,865,353.18 as of the Petition Date.

---

[9] The Debtor obtained an appraisal dated September 5, 2025 valuing the Debtor's assets at $12.5 million. The Debtor provided the appraisal to the Plan Sponsor and to the Secured Lender during the September 9, 2025, mediation. The appraisal does not include a valuation of the lease guarantee obligations.

[10] "***Property***" means the real property and its improvements located at 1917 Ashland Street, Houston, TX, 77008.

19.     During this case, the Debtor made $764,537.84 in post-petition payments to the Secured Lender. 11 U.S.C. § 502(b)(2) disallows any portion of claims for unmatured interest. Therefore, the Secured Lender's claim is currently $27,100,815.30.

20.     The Deed of Trust granted a lien and a security interest in the Debtor's assets including the Property, all fixtures, equipment, personal property, leases, rents, and land referred to in the Deed of Trust (collectively the "***Collateral***"). The Collateral also includes an assignment of leases and guarantee obligations related to such leases.

**D.     Chapter 11 Case Background**

21.     On February 20, 2025 (the "***Petition Date***"), the Debtor commenced with this Court a voluntary case under the Bankruptcy Code. The Debtor is authorized to continue to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 case.

22.     A more detailed description of the Debtor and its businesses is set forth in the *Declaration of Mirza N. Baig in Support of Debtor's First Day Motions* [Docket No. 19] filed in support of the Debtor's voluntary petition for relief under the Bankruptcy Code.

### III.     Relief Requested

23.     The Debtor seeks entry of an order, substantially in the form attached hereto (the "***Order***"): (a) finding that the Debtor incurred at least $1,477,629.97 in expenses that were reasonable, necessary, and beneficial to preserving property that is subject to the Secured Lender's lien; (b) permitting the Debtor to surcharge the Expenses against the Secured Lender under § 506(c) of the Bankruptcy Code; (c) setting the maximum amount that the Secured Lender may credit bid under § 363(k) at the Auction at $16,551,088.00; and (d) ordering that (i) the Secured

Lender deliver $1,477,629.97 to the Debtor as a condition of submitting a credit bid at the Auction or (ii) if the Secured Lender does not submit a credit bid at the Auction, the Plan Sponsor deliver $1,477,629.97 of the distribution owed to the Secured Lener under the Plan to the Plan Administrator on the Effective Date (as those terms are defined in the Plan).

### IV.    Jurisdiction and Venue

24.    This Court has jurisdiction over this Amended Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2).

25.    Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

26.    The bases for the relief requested herein are sections 105, 363(k), 506(c), and 552(b)(1) of title 11 of the United States Code (the "**Bankruptcy Code**"), rule 9013 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

### V.    Basis for Relief

**A.    The Court should surcharge $1,477,629.97[11] of Expenses to the Secured Lender under Section 506(c) of the Bankruptcy Code.**

27.    Section 506(c) of the Bankruptcy Code authorizes a debtor in possession to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c).

28.    The policy reason underlying the surcharge statute is that unsecured creditors should not be required to bear the costs of preserving or disposing of a secured creditor's collateral. *See PSI, Inc. v. Agullard (In re Senior-G & A Operating Co., Inc.)*, 957 F.2d 1290, 1298 (5th Cir.

---

[11] The $1,477,629.97 surcharge amount is through October 13, 2025. The Debtor will seek additional surcharge amounts through the Effective Date of the Plan.

1992) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.") (quoting *In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982)).

29.     To surcharge collateral under § 506(c), the movant must demonstrate that "(1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the creditor benefitted from the expenses." *In re Domistyle, Inc.*, 811 F.3d 691, 695 (5th Cir. 2015). Section 506(c) is equitable in nature, and the Fifth Circuit applies a "'hindsight' approach [] to prevent unjust enrichment" because "a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost." *Id.* at 696, quoting 4 Collier on Bankruptcy ¶ 506.05 (16th ed.). Surcharging collateral is appropriate when failure to do so "can result in the unjust enrichment that the statute aims to prevent." *Id.* at 699.

30.     As detailed in paragraphs 2 – 15 above, maintaining and preserving the Secured Lender's Collateral has been an expensive and time-consuming task. The chart below outlines the various categories and amounts of expenses (the "***Expenses***") incurred by the Debtor after the Petition Date through October 13, 2025 that the Debtor believes are covered under § 506(c).[12]

| Category | Payee | Sum of Debit |
|---|---|---|
| HVAC Rental | No Sweat Mechanical | $174,066.00 |
| **HVAC Rental Total** | | **$174,066.00** |
| Property Insurance | IPFS | $271,474.73 |
| **Property Insurance Total** | | **$271,474.73** |
| Repairs & Maintenance | AmTech – Elevators | $4,467.56 |
| | ChemAqua | $13,169.46 |
| | City of Houston - Permits | $111.89 |
| | Dionicio Castillo | $8,868.19 |
| | Dr Penguin HVAC | $1,220.51 |

---

[12] The Debtor is continuing to analyze its expenses incurred in this chapter 11 case and reserves their rights to modify the amount and type of Expenses sought in advance of any hearing or final determination on the surcharge amount.

| Category | Payee | Sum of Debit |
|---|---|---|
| | Facilities Mechanical - HVAC Repair | $5,048.84 |
| | Fire Power - Boiler replacement | $4,040.43 |
| | FirePro Tech | $1,363.95 |
| | High Demand Plumbing | $19,550.00 |
| | Hunton - Fire Inspections | $28,071.39 |
| | Liquid Waste Solutions LLC - Grease Trap | $466.61 |
| | Platinun Environmental | $825.00 |
| | Transwestern | $25,000.00 |
| | Vortex Colorado - Front Door | $2,232.63 |
| **Repairs & Maintenance Total** | | **$114,436.46** |
| **Utilities** | City of Houston (Water) | $59,365.96 |
| | Electric (Freepoint) | $159,373.41 |
| | Gas (Cokinos) | $20,476.71 |
| | Lovo (Telephone Line in Elevator) | $744.00 |
| | Trash (GFL) | $15,193.75 |
| **Utilities Total** | | **$255,153.83** |
| **Water Management** | ChemAqua | $64,390.95 |
| **Water Management Total** | | **$64,390.95** |
| **Professional Fees** | Harney Partners LLP | $11,605.00 |
| | Reed Smith LLP | $179,890.00 |
| **Professional Fees Total** | | **$191,495.00** |
| **Ad Valeorem Taxes (Accured Post-Petition)** | | **$406,613.00** |
| | | |
| **Grand Total** | | **$1,477,629.97** |

       i.   <u>The Expenses Are Necessary</u>

31.     An expenditure is "necessary" if it was incurred to preserve or increase the value of collateralized property, or to dispose of the property. *In re Domistyle, Inc.*, 811 F.3d at 698; *see also In re McCombs*, 436 B.R. 421, 449 (Bankr. S.D. Tex. 2010) (finding that expenses incurred in selling collateral were necessary to the administration of this case because the trustee "effectuated the sales in order to preserve the value of the properties for the estate and fulfill his duty to the unsecured creditors").

32.     An expenditure is also considered necessary for section 506(c) purposes if it is associated with operating or maintaining the collateral. *See Heartland Fed. Savings & Loan Assoc. v. Briscoe Enters. Ltd., II (In re Briscoe Enters. Ltd., II)*, 994 F.2d 1160 (5th Cir. 1993) (holding that costs associated with hiring an appraiser, architect, and marketing consultant to operate and expand an apartment complex were within the scope of section 506(c)); *In re Jack Kline Co., Inc.*, 440 B.R. 712, 754 (Bankr. S.D. Tex. 2010) (permitting surcharge of reasonable attorneys' fees incurred in connection with the preservation and sale of the secured creditor's collateral); *see also* 4 Collier on Bankruptcy ¶ 506.05[4] ("Necessary expenses include appraisal fees, auctioneer fees, advertising costs, moving expenses, storage charges, payroll of employees directly and solely involved with the disposition of the subject property, maintenance and repair costs, and marketing costs."). The "hindsight" approach adopted in *Domistyle* is agnostic as to a debtor's intent when incurring the expenses. *In re Domistyle, Inc.*, 811 F.3d at 696. The Debtor must show only that the expenses benefited the Secured Lender and were necessary to preserve the collateral.

33.     Here, all the Expenses were necessary to preserve the Collateral, including the generation of rental income. Specifically, (a) HVAC rental costs were necessary to ensure the Collateral remained operational for tenants; (b) property insurance costs were necessary to comply with United State Trustee guidelines, mitigate potential estate losses from hospital operations, and, in any case, were mandated to be in place at all times by the Secured Lender; (c) repairs, maintenance, utilities, and other operational expenses were necessary to ensure that the Collateral remained in good working order and was properly maintained to preserve its value; (d) water management and treatment costs were necessary for the Property's continued operations and

compliance with local rules and regulations; and (e) professional fees, including legal fees and fees of the CRO, were necessary to continue operating the Property.[13]

34.     Additionally, the Expenses were necessary at the time they were incurred. Rental income from Hospital tenants is the Debtor's only revenue source, Maintaining the Property is critical to Hospital operations and preserving Collateral value, which in turn primarily benefits the Secured Lender because it is undersecured.[14] The value of the Collateral would be substantially less had the Debtor and its advisors not taken these steps. Thus, the Expenses incurred by the Debtor have been, and continue to be, necessary to preserve the Collateral.

ii.     The Expenses Are Reasonable.

35.     Courts measure the reasonableness of expenses sought to be surcharged by analyzing the "totality of the circumstances" and normal commercial considerations. *In re Senior-G & A Operating Co., Inc.*, 957 F.2d at 1299. What is "reasonable" may exceed the costs and expenses a secured creditor would otherwise have incurred in foreclosing on the property itself if the collateral would benefit from required repairs and would be more marketable to buyers after reasonable improvements or similar sale preparation efforts. 4 Collier on Bankruptcy ¶ 506.05[5]; *see e.g., In re Hardy*, 39 B.R. 804, 807 (Bankr. N.D. Okla. 1984) (finding capital improvements including installation of an air-conditioning system to a mortgaged building reasonable as the improvements made the building habitable and preserved the building as a going concern); *Moister v. The Farmers Bank (In re Truitt)*, 15 B.R. 169, 172 (Bankr. N.D. Ga. 1981) (approving surcharge of costs of settling title dispute where clear title made the property more marketable).

---

[13] The Expenses only include professional fees related to Hospital operations and other services primarily aimed at benefitting the Collateral, including the DIP loans and negotiating a resolution with CLS. The Debtor is not seeking reimbursement of professional fees related to general case administration. Reed Smith incurred $1,114,427.50 in fees from February 1 through September 30, 2025. The legal fees portion of the Expenses is $179,890.00.

[14] If the Secured Lener was oversecured, improvements in Collateral value would insure to the unsecured creditors' benefit.

36.     Courts routinely find expenses directly related to preserving value or effecting dispositions of collateral, including, but not limited to, insurance costs, and maintenance and repair costs, employee salaries, to be reasonable. *See, e.g.*, *In re Domistyle, Inc.*, 811 F.3d at 694 (holding that costs for "security, repairs to the roof and electrical system, mowing, landscaping, utilities, and insurance premiums" were reasonable and necessary); *In re McCombs*, 436 B.R. at 449 ("[a]s such, the Ivy Run Property and the Ivy Run Lot—and, now, the Excess Proceeds—constitute 'property securing an allowed secured claim,' and the Trustee may recover out of the Excess Proceeds his costs and expenses incurred in 'preserving, or disposing of, such property' pursuant to [s]ection 506(c)"). The Expenses are these exact kinds of expenses—ordinary costs incurred in preserving and monetizing the Collateral.

   iii.     The Expenses Benefited the Secured Lender.

37.     "[E]xpenses recoverable under [s]ection 506(c) from a secured creditor's collateral must also have bestowed a 'benefit' on the secured creditor with respect to the creditor's collateral." 4 Collier on Bankruptcy ¶ 506.05[6]. The benefit requirement is met when an expense is "incurred primarily to preserve or dispose of encumbered property." *In re Domistyle,* 811 F.3d at 698; *see also* 4 Collier on Bankruptcy ¶ 506.05 ("[A] secured creditor receives a 'benefit' within the meaning of section 506(c) if the relevant expense preserved or increased the value of its collateral"). Importantly, "primarily" does not mean "solely"—instead, the benefit to the secured creditor must have a direct relationship to the collateral. *Domistyle*, 811 F.3d at 698.

38.     Whether an expense is primarily for a creditor's benefit is "case specific." *Senior-G & A Operating Co.*, 957 F.2d at 1300; *cf. McCombs*, 436 B.R. at 449 (noting that the trustee's services "unquestionably provided a direct benefit" to the creditor because, had the trustee not sold the collateral, either (i) the trustee would have abandoned the property, or (ii) a secured creditor

13

would have successfully moved to lift the stay); *Domistyle*, 811 F.3d at 701 (finding that trustee's "stewardship" of property was a direct and quantifiable benefit inuring to the secured creditor).

39.      When continued business operation is integral to maximizing value in disposing of the collateral, costs incurred to run the business generally provide the requisite benefit to the secured lender. *See Domistyle*, 811 F.3d at 700 (holding surcharge benefited lender because absent maintenance and care of the collateral, it would have "been left trying to sell a vacant building damaged by vandalism, filled with overgrown weeds, and saddled with a leaking roof").

40.      The Debtor determined in its business judgment that continuing Hospital operations and leasing available spaces to tenants would best maximize value. The Debtor believed that maintenance and repair of operational issues in the Hospital was necessary to maintain rental. The Secured Lender holds the senior security interest in both rental income and the Property. Accordingly, the Expenses, all of which relate to maintaining the Property and preserving the value of the Collateral, benefited the Secured Lender. *See Domistyle, Inc.*, 811 F.3d at 695 (the court deemed surcharges for electricity expenses, ad valorem taxes, and repairs to fixtures and improvements appropriate).

41.      The Expenses inured directly to the Secured Lender's benefit, and thus the unsecured creditors should not shoulder the Expenses' burden. The Secured Lender is not oversecured, and thus it is the principal party benefitting from the Debtor's efforts to preserve and maintain the Collateral. Section 506(c)'s "benefit" requirement was satisfied, and, because the Expenses are also necessary and reasonable, the requested surcharge is warranted.

**B.      "Cause" under 11 U.S.C. § 363(k) exists to limit the Secured Lender's credit bid to $16,551,088.00.**

42.      The Debtor's Plan includes a sale of the Debtor's assets under section 1123 of the Bankruptcy Code. The Debtor intends to hold an auction (the "***Auction***") in accordance with its

credit bid and bidding procedures motion. *See* Dkt. 158. The Secured Lender expressed its intention to credit bid the full outstanding indebtedness with no intention of offering incremental cash to compete against the Plan Sponsor, which ignores the reality that the Plan Sponsor's plan contributions are not entirely on account of the Secured Lender's Collateral.

43.     Section 363(k) permits a lienholder to bid at a sale of property subject to the lien and offset against the purchase price, "*unless the court orders otherwise*." 11 U.S.C. § 363(k) (emphasis added). Inequitable conduct by the lienholder is not required for the court to limit the lienholder's credit bid. *See In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, n.14 (Bankr. D. Del. 2014) (a "court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment."); *see also In re Phila. Newspapers, LLC*, 599 F.3d 298, 315-16 (3d Cir. 2010). Here, the Debtor believes that cause exists to limit the Secured Lender's credit bid to $16,551,088.00 for the reasons set forth below.

44.     Importantly, the Debtor does not operate the Hospital. The Debtor's sole business is leasing the Hospital and fulfilling landlord obligations. The Plan Sponsor desires to run the Hospital's operations through a series of integrated transactions with non-Debtor affiliates. Those non-Debtor agreements will provide a platform to address the Debtor's and non-Debtor's financial obligations to common creditors—including to CLS and REILS (a financial creditor of a non-Debtor whose $17 million debt is guaranteed by the Debtor).

45.     The Plan Sponsor intends to contribute millions of dollars of capital expenditures to improve the Hospital for the benefit of the Debtor's tenants, to make the Hospital attractive to future tenants, and launch the Reorganized Debtor into profitability.

46.     The Secured Lender's intention to credit bid flips the policy reason underlying credit bids on its head. Credit bid rights are intended to protect against the risk that the collateral is sold at a depressed price. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012). But here, the Secured Ledner seeks to ride the coattails of the Debtor's post-petition efforts that improved the Collateral's value, the Plan Sponsor's intended cash infusions, and the integrated transactions with non-debtor affiliates that result in the Plan's value.

47.     The Secured Lender intends to credit bid its full debt against the plan value that the Plan Sponsor is contributing on account of the integrated transaction with non-Debtors, including the Heights Health Acquisition Agreement ("***HHAA***"). The HHAA is a transaction between affiliates of Dr. Baig, the Plan Sponsor, and the Plan Sponsor's affiliates for the assignment of a 49% membership interest in Heights Healthcare, LLC—which is not the Debtor's asset or the Secured Lender's Collateral. *See* Plan, § I.(a)(70) (defining "Plan Funding" as "(i) the Sale Proceeds and (ii) the Heights Hospital Acquisition Consideration"; and Plan, § I.(a)(53) defining "Heights Health Acquisition Consideration" as "the consideration paid by the Plan Sponsor in connection with the [HHAA].").

48.     The Plan Sponsor's total funding to the Plan is $25 million, which includes the proceeds of the sale of the Secured Lender's Collateral and the consideration for the HHAA. The Debtor's appraisal of the Secured Lender's Collateral—which considers the value of the land, improvements, and rental income—is $12.5 million—***less than half of the outstanding debt***. The appraisal did not include the value of guaranty obligations of Dr. Baig and Rashid Sayed on lease obligations. However, the collective face value of the guaranty obligations is $4,051,088. *See* Ex.

2 (Lease Agreement between Debtor and North Houston Surgical Hospital), § 22 (Limitation on Liability).[15]

49.     The Debtor believes that an expert will value the guaranty obligations of these two individuals at far less than $4 million. But even at the guaranty obligations' face value, the collective value of the Secured Lender's Collateral is no more than $16,551,088.

50.     The Secured Lender cannot credit bid on property that its lien does not encumber. *See* 11 U.S.C. § 363(k) (applying to "property that is subject to a lien"); *In re Free Lance-Star Publishing Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014) (approving credit bid only to encumbered property after separating unencumbered property).  In *In re Residential Cap.*, 501 B.R. 549 (Bankr. S.D.N.Y. 2013) ("***ResCap***"), the bankruptcy court determined that the secured lender's lien did not attach to goodwill generated post-petition.

51.     In *ResCap*, the Debtor improved the assets' value through time, effort, and expense of estate resources. *See id*. at 173–74. The court noted that the value of the debtor's assets were "seriously impaired," including because of litigation and possible seizures of assets. *See id*. at 170. The debtor did not have a commitment from the buyer to purchase the Debtor's assets in their condition at the petition date.

52.     The *ResCap* court determined that the debtors' hard work to achieve settlements and push the case to the asset sale closing generated value over which the secured creditor's lien did not attach. The court cited 11 U.S.C. § 552(b), which provides that if a prepetition security agreement extends to proceeds of collateral, the postpetition proceeds are subject to the security

---

[15] Section 22 of the Lease Agreement limits the guarantors' collective guarantee to the sum of the ordinary (non-penalty) base rent and the tenant's pro rata share of operating expenses accrued in the 12 months preceding the demand on the guarantee.  The first amendment to the Lease Agreement provides the tenant's base rent amount for each square foot of each floor of the premises and the approximate gross square footage of each floor, which total an obligation of $4,051,088 annually. *See* Ex. 3 (First Amendment to NHSH Lease Agreement).

agreement, "***unless the court orders otherwise after a hearing based on the equites of the case***." *Id*. at 172 (emphasis added).

53.     Here, the Debtor has not agreed in any cash collateral order to waive any "equities of the case" argument under § 552(b). The court should determine that the Secured Lender does not have a lien over any goodwill or value generated by the Debtor's post-petition efforts, which contributes to the Plan Sponsor's willingness to contribute $25 million to the Plan.

54.     The Debtor's and its professionals' efforts to salvage the Hospital from a freefall decline in value are detailed in paragraphs 2 through 15 above. The Secured Lender should not be allowed to foist its credit bid rights over property to which it does not have a lien.

55.     The Court's limitation of the Secured Lender's credit bid right to $16,551,088.00 is more than fair because it accounts for the full face value of guarantee obligations of two individuals. Without the Court's limit on the credit bid, the Secured Lender will use its credit bid rights as a sword against the Debtor's unsecured creditors (depriving them of meaningful recoveries under the Plan) and the Debtor's reorganization efforts.

**C.     The Court should require the Secured Lender to pay the $1,477,629.97 surcharged amount as a condition to credit bidding.**

56.     Under § 506(c), the debtor in possession may recover the surcharged amount from "property securing an allowed claim." When the property is sold, surcharge expenses are ordinarily paid from the sale proceeds. *See In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1067 (9th Cir. 2001). However, the interplay between § 363(k)'s credit bid rights and § 506(c) surcharge presents a conundrum because there no sale proceeds from a winning credit bid from which to pay the surcharge.

57.     Judge Rodriguez encountered the §§ 363(k)/506(c) conundrum in *In re Crane*. *See* 641 B.R. 850 (Bankr. S.D. Tex. 2022). In *Crane*, the debtor's proposed auction procedures

provided that notwithstanding § 363(k), any party submitting a non-cash bid was required to pay cash consideration to fund a broker's sale commission. *See In re Crane*, No. 21-33218, dkt. 253 (Bankr. S.D. Tex. May 17, 2022). Secured creditors objected on various bases, including that the proposed procedure violated their § 363(k) credit bid rights. *See id*., dkts. 265, 266, 267, 270.

58.     Judge Rodriguez observed that nothing in § 506(c) nor Fifth Circuit precedents prevents a court from permitting a surcharge against the collateral of a successful credit bidder, provided the surcharge elements are met. *See Crane*, 641 B.R. at 864. The court cited with approval the *In re A 1 Plank & Scaffold Manufacturing* case where the bankruptcy court required the credit bidding secured lender to fund in cash a § 506(c) surcharged expense prior to conveyance of the property. *See* 437 B.R. 689.

59.     The court also discussed *Borreo Springs*, where the Fifth Circuit reversed *only on jurisdictional grounds* a bankruptcy court imposing a judicial lien on property subject to a winning credit bid superior to the secured creditor's preexisting lien for § 506(c) surcharged expenses. *See Crane*, 641 B.R. at 864, discussing *In re Skuna River Lumber, LLC*, 564 F.3d 353 (5th Cir. 2009); *see also* 4 Collier on Bankruptcy ¶ 506.05[1] (16th ed.) ("[s]ection 506(c) creates a special priority for the surcharged expense ahead of the secured creditor's priority to the property.").

60.     The Fifth Circuit reasoned that the bankruptcy court lost jurisdiction to surcharge the property once the sale was consummated and the property left the estate. *See id*. at 356. However, the Fifth Circuit counseled that if a bankruptcy court wishes to retain jurisdiction over the property, "it should have withheld approval of the sale pending [the secured creditor's] **payment** of the [surcharged expenses]." *See id*. (emphasis added).

61.     Unlike in this case, the debtor in *Crane* did not seek a pre-auction ruling from the bankruptcy court that the proposed surcharge expense met § 506(c) and applicable Fifth Circuit requirements. Thus, the secured creditors were not required to pay incremental cash at the auction.

62.     Here, the Debtor followed the proper procedure that permits this Court to grant the relief that the *Borrero Springs* and *Crane* courts procedurally could not—requiring the Secured Lender to pay in cash the § 506(c) surcharge expenses notwithstanding its § 363(k) credit bid rights. Judge Rodriguez also sustained the secured creditors' objections to the auction procedures because the amount of the secured creditors' credit bid had not been established—another fact that (by this Motion) distinguishes this case from *Crane*. *See Crane*, 641 B.R. at 868.

**D.     Section 105(a) of the Bankruptcy Code supports the Court's granting of the Debtor's requested relief.**

63.     11 U.S.C. § 105(a) provides that the court may issue any order that is necessary "or" appropriate to carry out provision of the Bankruptcy Code. Section 363(k)'s use of the phrase "for cause" implicates the Court's inherent equitable powers. *See In re RML Dev., Inc.*, 528 B.R. 150, 155 (Bankr. W.D. Tenn. 2014) ("acting 'for cause' looks to the court's equity powers that allow the court to balance the interests of the debtor, its creditors, and the other parties of interests in order to achieve the maximization of the estate and an equitable distribution to all creditors"), citing *Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008) and § 105(a). The bankruptcy court should "modify or deny a § 363(k) credit bid when equitable concerns give it cause." *See id*.

64.     This case presents unique facts where the Debtor who entered a freefall chapter 11 with insufficient revenue to pay operational expenses—resulting in continuing Collateral value decline to a point that is less than half of the secured debt—achieved the unthinkable: a Plan that will pay the Secured Lender far in excess of the Collateral's appraised value, a global settlement

with the Debtor's limited partner (CLS) and the Debtor's largest unsecured creditor (REILS), a meaningful return to unsecured creditors, payment of administrative expenses and taxes, and funding a winddown trust to responsibly winddown the Debtor.

65.     The Secured Lender's threats of credit bidding to retrieve its Collateral following the Debtor's herculean efforts to invigorate and sustain Hospital operations, prevent further value deterioration, and attempt to confirm a chapter 11 plan that is remarkable under these circumstances contravenes fundamental bankruptcy policy.

## VI.     Conclusion

66.     The Debtor does not request that the Court outright deny the Secured Lender's credit bid rights. Rather, the Debtor requests that upon reviewing the evidence that the Debtor will present at the October 27, 2025 hearing, the Court exercise authority granted to it under §§ 105(a), 363(k), 506(c), 552(b) to: (1) limit the Secured Lender's credit bid to $16,551,088.00, (2) require the Secured Lender to pay to the Debtor the surcharge expenses of $1,477,629.97 as a condition to credit bidding at the Auction, and (3) grant to the Debtor any other equitable relief that the Court deems appropriate.

Dated: October 13, 2025
Houston, Texas

Respectfully submitted,

By:      */s/  Omar J. Alaniz*
**REED SMITH LLP**
Omar J. Alaniz (SBN 24040402)
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
E-mail: oalaniz@reedsmith.com

*Counsel for the Debtor*
*and Debtor-in Possession*

## Certificate of Service

I certify that on October 13, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Omar J. Alaniz*
Omar J. Alaniz