IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § § § § | Chapter 11 |
| PLATINUM HEIGHTS, LP,[1] | | Case No. 25-90012 (ARP) |
| Debtor. | | |

### DECLARATION OF DR. MIRZA BAIG IN SUPPORT OF DEBTOR'S SECOND AMENDED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO SURCHARGE CERTAIN COLLATERAL, (II) DIRECTING THE SECURED LENDER TO PAY THE SURCHARGED AMOUNTS, (III) SETTING THE AMOUNT OF THE SECURED LENDER'S CREDIT BID AT AN AUCTION, AND (IV) GRANTING RELATED RELIEF

I, Mirza N. Baig, hereby declare under penalty of perjury the following:

1. I submit this declaration in support of the *Debtor's Second Amended Motion for Entry of an Order (I) Authorizing the Debtor to Surcharge Certain Collateral, (II) Directing the Secured Lender to pay the Surcharged Amounts, (III) Setting the Amount of the Secured Lender's Credit Bid at an Auction, and (IV) Granting Related Relief* [Dkt. No. 173] (the "**Surcharge Motion**").[2]

2. I am the manager of Nexus Capital Partners Real Estate Investments LLC ("**Nexus**"), which is the general partner of the above captioned debtor and debtor in possession (the "**Debtor**"). I am also the principal equity holder of the Debtor. In my capacity as manager of Nexus and as the principal equity holder of the Debtor, I am familiar with the facts and circumstances set forth herein, which are based on my actual knowledge as well as information

---

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is Platinum Heights, LP (4367). The location of the Debtor's corporate headquarters and the Debtor's service address is: 1917 Ashland Street, Houston, Texas 77008.
[2] Capitalized terms used herein but undefined have the meaning provided in the Surcharge Motion.

and advice provided to me by the Debtor's management, professionals, attorneys, and advisors. In addition, the statements made herein are based, in whole or part, upon my review of public and non-public documents and my discussions with other members of the Debtor's management team and advisors on whom I have relied. I am generally familiar with Debtor's business, financial condition, day-to-day operations, and the circumstances leading to the commencement of this chapter 11 case (the "**Chapter 11 Case**"). Except as otherwise noted, I have personal knowledge of the matters set forth in this declaration (this "**Declaration**") or have gained knowledge of such matters from the Debtor's employees or retained advisers in the ordinary course of my responsibilities.

3. I believe, to the best of my knowledge, that the facts and circumstances set forth herein are true and correct. References to bankruptcy, the chapter 11 process, and related legal matters are based on my understanding of such in reliance on the explanation provided by, and the advice of, counsel to the Debtor. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I would testify competently to the facts set forth herein.

4. On February 20, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). The Debtor is a Texas limited partnership. The Debtor's principal real estate asset is a medical professional building referred to as the "Heights Hospital" (the "**Hospital**") located at 1917 Ashland Street, Houston, TX, 77008 (the "**Property**"). The Hospital and Property are both subject to the Secured Creditor's liens.

**The Hospital's Tenants**

5. The Hospital currently has two tenants, PAM Healthcare ("**PAM**) and Ashland Healthcare ("**Ashland**"). Prior to the Petition Date, the Debtor lease space in the Hospital to another tenant, North Houston Surgical Hospital ("**North Houston**") who exited the Hospital in 2024. North Houston was the Debtor's largest tenant and responsible for the majority of the Debtor's rental income while it was in operation.

a. *PAM Healthcare*

6. In 2018, PAM executed a lease with a predecessor to the Debtor (the "**PAM Lease**"). Prior to and after the Petition Date, PAM has asserted various operational issues regarding the Hospital and the Property. Based on these asserted deficiencies, PAM has threatened to terminate the PAM Lease and/or offset payment of rent. As the landlord of the Hospital, loss of PAM's rental payments would adversely impact the Debtor's ability to maintain the Property.

7. Throughout the Chapter 11 Case, the Debtor worked closely with its advisors to address PAM's concerns, many of which concerned the physical state of the Property and operational capabilities of the Hospital. Addressing these concerns required significant investments of time, effort and capital as set forth in the Motion.

b. *Ashland Healthcare*

8. Ashland executed a lease with the Debtor (the "**Ashland Lease**") providing Ashland with two floors in the Property, including an Emergency Room. At the time the Ashland Lease was executed, Ashland was a joint venture with an entity know as Omni Group ("**Omni**") who controlled Ashland's operations.

9. Pursuant to the Ashland Lease Ashland pays the Debtor monthly rent of approximately $275,879. At the time the Ashland Lease was executed, PAM was the only paying

tenant of the Property, and its rental income was insufficient to support the Debtor's monthly operational costs. As such, securing the Ashland Lease and ensuring Ashland was able to pay rent immediately was of paramount importance to the Debtor, the Property and the Hospital.

10. Prior to the bankruptcy filing, the Debtor and Amtech Elevator Services ("**Amtech**") entered into agreements to modernize elevators and to service the elevators. The Debtor fell behind on payments owed to Amtech prior to the bankruptcy. The Ashland Lease provides that Ashland did not have to make rental payments until certain requirements were met, including access to three functioning elevators. Amtech ceased work on the elevator repairs demanding payment of prepetition amounts after the bankruptcy filed. My understanding is that the Debtor's advisors connected with Amtech and informed them that their actions were violative of the Bankruptcy Code and work resumed on the elevators. As of the date hereof, there are now three functioning elevators in the Property. Work on the remaining elevators will resume if Amtech's agreements are assumed and cured. My understanding is that the Plan Sponsor intends to assume the Amtech agreements and cure the defaults.

11. Leading into late Spring 2025, Ashland continued to argue that it was not "fully operational" notwithstanding that the Hospital had the necessary number of functioning elevators under the Ashland Lease. Ashland delayed paying rent because of its argument that Ashland was not fully operational. The delay in Ashland's operations put considerable strain on the Debtor's balance sheet and operations as the Debtor was relying on Ashland's rental income.

12. Ultimately, Omni withdrew from the Ashland joint venture prior to Ashland becoming a paying tenant of the Hospital. When the Ashland joint venture was formed, Omni was intended to be the operating partner, responsible for the day to day operations. Omni's withdrawal occurred at a critical juncture and left Ashland without an operator. This put Ashland in the

unforeseen and precarious situation of deciding how to proceed without an operating partner. Notwithstanding the lack of an operating partner, the Debtor its principals and Ashland cooperated to bring Ashland online as a paying tenant.

### Costs Related to Operating the Hospital

13. Maintaining operations at the Hospital has been an arduous process. Prior to its departure, North Houston was the operator for the majority of the Hospital (excluding the floors leased to PAM). Upon North Houston's departure, Omni, through Ashland, was to be the next operating entity. Upon Omni's exit from the Ashland join venture, another affiliated entity, White Rock Medical Center ("**White Rock**"), assumed operational management responsibilities over the Hospital. These management responsibilities included, among other things: (i) maintaining active licenses for Medicare and Medicaid, (ii) preserving clinical continuity in the Hospital and ensuring patient safety, (iii) managing employees, equipment and vendor contracts, and (iv) sustaining value for the Secured Creditor through the identification of a new operator.

14. White Rock Medical Center is not a Houston hospital operator. White Rock and the Debtor are actively searched for a new operating partner. In the interim instead of offering the typical suite of services, White Rock has focused on operational efficiencies through core statutory and regulatory compliance, regulatory maintenance and asset stabilization to bring the Hospital as close to revenue generating as possible.

15. The financial impact of operating the Hospital has been significant. I estimate that operational losses between the Debtor, White Rock and affiliate NCP Management are approximately $400,000 per month. This monthly shortfall is attributable to among other things, funding ongoing operations and the Hospital, ensuring regulatory compliance, responding to and

preparing for routine and statutory audits and the like. I believe that these losses are costs arising directly from the preservation of the value of the Hospital and the Property.

## DIP Financing

16. In addition to addressing tenant concerns and securing tenants for the Property, I also personally loaned the Debtor an aggregate $605,000 over three separate debtor in possession financing loans (collectively, the "**DIP Loans**"). The DIP Loans were negotiated at arm's length and approved by the Court. The DIP Loans were used for maintenance of the Property and to provide operational stability to the Debtor. But for the DIP Loans I do not believe the Debtor would have been able to seamlessly maintain its operations upon transitioning into chapter 11. The DIP Loans were made with the Secured Lender's knowledge and the Secured Lender did not object to the DIP Loans. Ultimately the DIP Loans allowed the Debtor to continue operating the Hospital and ensured the Property was maintained throughout the course of this Chapter 11 Case.

## Property Maintenance and Expenses

17. The Debtor invested significant money and effort in maintaining the Property. Among other things, the Debtor's HVAC owner threatened to remove the Hospital's "chiller"- a large scale cooling system - for prepetition past due amounts. The effect of this removal would have been catastrophic. Without a chiller the Debtor would have no choice but to cease operations and shut down the hospital. The Debtor's lease agreement is with an intermediary, which complicated the Debtor's options. The Debtor was able to negotiate with the chiller vendor and ensure continued chiller access. Absent these efforts, the Hospital would not be functional and would generate no rental income for the maintenance of the Property.

18. After the Petition Date, another of the Debtor's critical vendors, ChemAqua, threated to discontinue services because of past-due amounts. ChemAqua is the only vendor able

to perform the water testing necessary for the Debtor's protocol compliance with the City of Houston related to the legionella testing.  Were ChemAqua not convinced to maintain services, the Debtor would have no manageable way of complying with its reporting requirements. Failure to adhere to these requirements would have resulted in additional costs and litigation at best, and cessation of operations at worst.

19. In addition to these and many other vendor specific issues, the Debtor also spent significant time and effort on plumbing and HVAC repairs which directly benefited the Secured Lender's collateral. The Debtor's repairs included replacing and fixing domestic water pumps to address issues with water pressure on certain floors of the Hospital, fixing a leak that impacted the space leased to PAM, replacing sump pumps, remediating flooding in the basement, and retaining vendor Facilities Mechanical to troubleshoot the Hospital's pneumatic system.

[*Remainder of Page Intentionally Left Blank*]

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 24, 2025
       Houston, Texas

*/s/ Mirza N. Baig*
Mirza N. Baig