IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PLATINUM HEIGHTS, LP | § | Case No. 25-90012 (ARP) |
| | § | |
| Debtor. | § | |

**B1 BANK'S OBJECTION AND RESPONSE TO DEBTOR'S SECOND AMENDED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO SURCHARGE CERTAIN COLLATERAL, (II) DIRECTING THE SECURED LENDER TO PAY THE SURCHARGED AMOUNTS, (III) SETTING THE AMOUNT OF THE SECURED LENDER'S CREDIT BIT AT AN AUCTION, AND (IV) GRANTING RELATED RELIEF**

Secured creditor, b1 Bank ("b1 Bank"), files its Objection and Response to Debtor's Second Amended Motion for Entry of an Order (I) Authorizing the Debtor to Surcharge Certain Collateral, (II) Directing the Secured Lender to Pay the Surcharged Amounts, (III) Setting the Amount of the Secured Lender's Credit Bid at an Auction, and (IV) Granting Related Relief (the motion will be referred to as the "Second Amended Motion)."

## Introduction

1. This Chapter 11 proceeding was filed on February 20, 2025. [Dkt. 1].

2. On August 1, 2025, Debtor first filed its emergency motion to surcharge certain collateral held by b1 Bank as a secured creditor in this case. [Dkt. 128].

3. On August 8, 2025, Debtor and b1 Bank filed a stipulation, in part, postponing the hearing on Debtor's motion and approving mediation. [Dkt. 130].

4. Thereafter, the parties proceeded to mediation with Hon. Harlin Dewayne Hale (Ret.) on September 9, 2025. Mediation was unsuccessful.

5. On September 10, 2025, Debtor unilaterally rescheduled a hearing on its motion for September 23, 2025. [Dkt. 138].

6. On September 15, 2025, Debtor filed its proposed Chapter 11 plan of reorganization and disclosure statement, together with its request for an emergency hearing. [Dkt. 140, 141, 142]. These matters were set for hearing on September 23, 2025, at 8:00 a.m. but subsequently removed from the Court's docket.

7. On September 16, 2025, Debtor filed its amended emergency motion to surcharge certain collateral held by b1 Bank. [Dkt. 143]. This matter was set for hearing on September 23, 2025, at 8:00 a.m. [Dkt. 143]. The hearing was subsequently removed from the Court's docket.

8. On October 13, 2025, Debtor filed the Second Amended Motion. [Dkt. 173]. This matter is set for hearing on October 27, 2025 at 9:00 a.m. [Dkt. 173].

9. In the Second Amended Motion, Debtor seeks entry of an order: (a) finding that the Debtor incurred at least $1,477,629.97 in expenses that were reasonable, necessary, and beneficial to preserving property that is the subject to b1 Bank's lien; (b) permitting the Debtor to surcharge the Expenses[1] against b1 Bank under §506(c) of the Bankruptcy Code; (c) setting the maximum amount that b1 Bank may credit bid under §363(k) at the Auction at $16,551,088.00; and (d) ordering that (i) b1 Bank deliver $1,477,629.97 to the Debtor as a condition of submitting a credit bid at the Auction or (ii) if b1 Bank does not submit a credit bid at the Auction, the Plan Sponsor deliver $1,477,629.97 of the distribution owed to b1 Bank under the Plan to the Plan Administrator on the Effective Date (as those terms are defined in the Plan).

10. This Bankruptcy case has been about one thing. It's not about reorganization. The Debtor is selling its assets and will wind down. It's not about obtaining the best price for the assets

---

[1] Expenses are defined in the Second Amended Motion. *See* Page 9-10.

for any benefit to Debtor. Indeed, the Debtor's initial plan filed in this case curiously contemplated a sale of the Debtor's assets to the Plan Sponsor without even conducting an auction or allowing any competitive bids. *See* Dkt. 140. Why would a Debtor sell its assets to a third party without at least inviting other competitive bidders to potentially drive up the price? The reason is clear.

11. This Bankruptcy is about Dr. Mizra Baig, the Debtor's insider, employing a process to shed at least $21 million in personal liability by having the Plan Sponsor work side-deals with unsecured creditors of Debtor, which debt is also guaranteed personally by Dr. Baig. Such side-deals are designed to pay these debts a handsome sum to clear the path for the Plan Sponsor to take the assets. In fact, the Plan Sponsor, in an effort to clear the path to operate the Hospital, is offering to pay REILS (defined below) $10 million in cash on its unsecured claim in excess of $17 million. Not coincidentally, Dr. Baig is personally liable on the amounts owed to REILS. The problem with this process is not that the side-deals are being made, but that the side-deals (and subsequent abolishing of personal debt obligations of Dr. Baig) are being used as a sword to attempt to unilaterally cram down b1 Bank and steer the assets to one chosen party; the Plan Sponsor. The real winner in this process is not the estate or the Debtor and certainly not b1 Bank. It appears to be an exit plan for Dr. Baig.

12. b1 Bank's specific responses to the arguments asserted in the Second Amended Motion are below.

**Objection and Response**

I. <u>**The Expenses requested to be surcharged should be disallowed.**</u>

    A. **Equities in this case, as it relates to the surcharge, cut against the Debtor**

13. The Second Amended Motion is primarily focused on Debtor's attempts to improperly surcharge various expenses to b1 Bank pursuant to Section 506(c) of the Bankruptcy

Code. Section 506(c) is an **equitable** remedy, which is an **extraordinary exception** to the general rule in bankruptcy that administrative expenses must be borne out of the unencumbered assets of the estate. *See §506(c); In re Domistyle, Inc.* 811 F.3d 691, 695-696 (5th Cir. 2015). Given the equitable component of Section 506(c), Debtor's surcharge attempts fail - without regard to the elements of the provision.[2]

14. Specifically, Debtor has maintained two income sources throughout the pendency of this bankruptcy: (1) rents ("Rents") received from tenants at the Hospital (as defined in the Second Amended Motion) and (2) Debtor in Possession loans ("DIP Loans") made to Debtor from its principal and insider, Dr. Baig[3], who, not insignificantly, personally owes the Debtor at least $4,000,000.00 based on a personal guaranty on a defaulted lease obligation at the Hospital ("Baig Lease Guaranty"). *See* Second Amended Motion, Page 16. The Rents, the Hospital, the Baig Lease Guaranty, and other lease guaranties in connection with the Hospital constitute the collateral of b1 Bank ("b1 Collateral").

15. In addition to the Baig Lease Guaranty, Dr. Baig is also personally liable for the amounts due to REILS Finance SPV, Inc. ("REILS") of at least $17,000,000.00. *See* Claim No. 11-1. The Rents and DIP Loans were used to pay the majority of Expenses (other than claimed Ad Valorem taxes, which have not even been paid by the Debtor or any other party). *See* Second Amended Motion, Page 9-10. Hence, it would be grossly inequitable for Debtor to be able to surcharge them.

---

[2] The elements of 506(c) require the trustee to prove: (1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the creditor benefitted from the expenses. *See §506(c); In re Domistyle, Inc.* 811 F.3d 691, 695-696 (5th Cir. 2015). Although Debtor's Second Amended Motion fails on equitable grounds alone, these elements will be addressed in Part B of this response.

[3] The General Partner of Debtor is Nexus Capital Partners Real Estate Investments, LLC. Dr Baig is the Manager of this entity.

16. Further, as mentioned, Debtor seeks to improperly (an inequitably) surcharge ad valorem tax expenses that have not even been paid. And finally, even though Debtor used b1 Bank's Cash Collateral to pay the Expenses, Debtor seeks to require b1 Bank to directly pay these amounts at what is essentially **a second time** through a surcharge as a condition to credit bidding. Each of these points is further addressed below. Additional details regarding the inequities of the attempted surcharge are set forth in Subsections i– iv below.

i.   *Cash Collateral*

17. The Rents constitute b1 Bank's collateral ("Cash Collateral"). *See* Assignment of Leases and Rents dated September 28, 2022, attached to b1 Bank's Claim No. 10-1. There is no windfall or unfair benefit to b1 Bank with respect to the Expenses because the Expenses have been paid for by the Cash Collateral. On April 23, 2025, a Final Order Authorizing Postpetition Use of Cash Collateral was entered, authorizing Debtor to maintain a DIP Account at b1 Bank containing all sources of cash constituting Cash Collateral (the "Cash Collateral Order"). [Dkt. 95] The budget attached thereto indicated the Cash Collateral would be disbursed for the following expenses: property insurance, HVAC Rental, Utilities, Security & Janitor Services, Medgas, Water Management, Repairs and Maintenance, and other general/administrative expenses. These are the very expenses Debtor now seeks to surcharge. *See* Second Amended Motion, Page 9-10. It is entirely inappropriate (and grossly inequitable) to allow Debtor to use b1 Bank's Cash Collateral to purportedly preserve the Hospital[4], which in itself is already an effective surcharge, and then seek to require b1 Bank to come out of pocket for these same expenses.

---

[4] As will be further addressed in Part B, b1 Bank disputes that the Expenses were incurred to benefit b1 Bank.

**B1 BANK'S OBJECTION AND RESPONSE TO SECOND AMENDED MOTION**     **Page 5 of 17**

      ii.      *DIP Loans from Dr. Baig*

18. Debtor's request to surcharge b1 Bank for the DIP Loans is absurd on its face. It is a thinly veiled attempt to personally benefit Dr. Baig, an insider of the Debtor. Dr. Baig is directly obligated to Debtor per the Baig Lease Guaranty. *See* Second Amended Motion, Page 16. Dr. Baig, who owes the Debtor at least $4,000,000.00, curiously loaned money to the Debtor under the DIP Loans totaling $605,000.00, which were used to cover a portion of the operational expenses Debtor now seeks to surcharge. *See* Second Amended Motion, Page 4, 9-10. Again, it would be unjust for Debtor to surcharge amounts loaned to them by Debtor's insider when that insider already owes the Debtor at least $4,000,000.00.

      iii.      *Ad Valorem Taxes*

19. Next, Debtor seeks to surcharge ad-valorem taxes in the amount of $406,613.00, **which have not yet been paid** by Debtor or any third party. This situation was recently addressed by the Southern District of New York. *See In re Broadway Realty I Co., LLC,* No. 25-11050 (DSJ), 2025 WL 1803089, at *1 (Bankr. S.D.N.Y. June 29, 2025). Specifically, the debtor sought to surcharge various expenses on the theory that they benefited the secured lender. The motion was denied on various grounds, and the court found the surcharge attempt to be particularly egregious because it was attempted to be applied "prospectively" - before the expenses were actually incurred. Debtor's attempt to prospectively surcharge ad valorem taxes, which have not yet been paid, is similarly egregious. Further, as Debtor intends to sell substantially all assets (including the Hospital), Debtor will not ever pay the ad valorem taxes associated with the Hospital. The ad valorem tax liability will be the responsibility of the winning bidder at auction. This request is improper. *See Houston Reg'l Sports Network, L.P.* 886 F.3d, 528 (5th Cir. 2018). Not only are the ad valorem taxes not an expense that has

been paid by the Debtor, ad valorem taxes are the responsibility of the Debtor who continued to operate its business during the bankruptcy. In *In re Consolidated Cotton Gin Co. Inc*. 347 B.R. 572, 576 (N.D. Tex. 2006), the Court stated:

> The default rule in bankruptcy is, accordingly, that administrative expenses are paid out of the estate and not by the secured creditors of the debtor." (emphasis added). This is the same standard applied by the Bankruptcy Court for the Southern District of Texas in *In re Mort Hall Acquisition, Inc.,* 181 B.R. 860 (Bankr. S.D. Tex 1994) ("Incidental benefits derived from property taxes do not trigger section 506(c); the benefits to secured creditors must be direct and quantifiable.") and the Bankruptcy Court for the Eastern District of Texas in *In re Westwood Plaza Apartments, Ltd.,* 154 B.R. 916 (Bankr. E.D. Tex. 1993) **HN7** ("To charge a secured creditor with the administrative expenses under § 506(c), there must be a showing that the fees and expenses were: (1) necessary, (2) reasonable, and (3) incurred primarily for the benefit of the secured creditor resulting in a quantifiable direct benefit to the secured creditor.").
>
> Paying the ad valorem taxes incurred while in possession of the property against which the taxes are assessed does not satisfy the direct benefit test articulated by the courts. *See In re C.S. Assocs.,* 29 F.3d 903, 907 (3rd Cir. 1994). Consolidated Cotton owned the property and was using it in its operations and was therefore legally obligated to pay the ad valorem taxes. Authorizing a surcharge for the ad valorem taxes would be more of a windfall than a reimbursement to Consolidated Cotton. It would also be analogous to allowing a debtor to surcharge an inferior lienholder on property to the extent the debtor made payments on a prior lienholder's claim. The addition of paid ad valorem taxes as an expense potentially subject to reimbursement by the amendments to section 506(c) and does not alter the Court's conclusion on this issue.

20. One must question the reasoning of Debtor's request as it fails on its face. If b1 Bank is required to pay the ad valorem taxes just to be able to bid at auction, it creates a windfall to Debtor or any third-party bidder as b1 Bank would just be fronting taxes for another party's benefit. Therefore, such a surcharge in the ad valorem taxes is, by definition, not for the benefit of b1 Bank and must not be allowed.

    iv.    *Request for Payment as a Condition to Credit Bid*

21. As addressed in Section (A)(i) and (ii) above, the (actually paid) Expenses sought to be surcharged were paid using b1 Bank's Cash Collateral, or funds that Debtor's principal

"loaned" to Debtor. Section 506(c) is designed to prevent a secured creditor from reaping the benefits of preserving the secured collateral without shouldering the costs, which would result in a windfall to the secured creditor. *See Domistyle,* 811 F.3d *at* 695-696 (5th Cir. 2015). The provision is invoked to avoid the unfairness/inequity of requiring the general estate and unsecured creditors to bear the cost of protecting what is not theirs. *Id.*

22. As will be further explained below, the Expenses sought to be surcharged do not meet the elements of 506(c). But what is particularly egregious is that Debtor doesn't simply seek a credit against the b1 Bank's collateral for the Expenses (which again, b1 Bank would oppose such a credit). Instead, Debtor asserts b1 Bank should be required to pay (for a second time) the Expenses as a condition to credit bidding. *See* Second Amended Motion, Page 18. That Debtor would even make such an assertion is at best, nonsensical, and clearly would result in an inequitable result.

### B. Elements of Surcharge

23. To reiterate, Debtor's surcharge positions are inequitable and that alone prohibits them from getting the relief sought in the Second Amended Motion. But to the degree, if any, this Court reaches the merits of the 506(c) elements, Debtor must prove (1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the creditor benefitted from the expenses. *In re Domistyle, Inc.* 811 F.3d 691, 695-696 (5th Cir. 2015).

*i.   Necessity of Expenses*

24. Debtor asserts the various expenditures were necessary to preserve the Collateral. However, when seeking to use b1 Banks' Cash Collateral to pay many of these expenses, Debtor stated the funds were needed to be able to provide patient care. While the expenses may have been necessary in that sense, Debtor has not met <u>their burden</u> to similarly show these expenses were

necessary to preserve the Hospital. *See French Mkt. Homestead v. P.C. Ltd. (*In re P.C. Ltd.), 929 F.2d 203, 205 (5th Cir. 1991); *New Orleans Pub. Serv., Inc. v. First Fed. Sav. & Loan Ass'n of Warner Robins, Ga. (In re Delta Towers),* 924 F.2d 74, 76, 24 C.B.C.2d 1431, 1433 (5th Cir. 1991). Debtor is a merely a landlord and does not operate the Hospital or provide patient care.

    ii.    *Reasonableness of Expenses*

25.    Debtor has simply asserted that the expenses sought to be surcharged are reasonable, but has provided no evidence to meet <u>their burden</u> to show the invoices set forth reasonable amounts. *Id.* B1 Bank challenges the reasonableness of all Expenses asserted by Debtor.

    iii.    *Benefit to Creditor*

26.    The 5th Circuit employs a "hindsight" approach in assessing whether the secured creditor benefitted from expenses incurred to preserve secured collateral. *See Domistyle,* 811 F.3d *at* 695-696. However, the equitable nature of 506(c) is still relevant to this element, and there is **<u>no inequity</u>** when the estate (Debtor) bears the burden of general administrative costs that only incidentally benefit a secured creditor. *Id.* Prepetition as well as post-confirmation expenses are generally **<u>not</u>** recoverable under Section 506(c). *See In re Hardage*, 69 B.R. 681 (Bankr. N.D. Tex. 1987, rev'd on other grounds, 837 F.2d 1319 (5th Cir. 1988).

27.    Debtor relies heavily on the *Domistyle* opinion to support their position that the Expenses they seek to surcharge benefitted b1 Bank. However, the facts in *Domistyle* are clearly distinguishable from this case. Specifically, the trustee in *Domistyle* testified that he incurred certain expenses to maintain/preserve the secured collateral (an industrial building). Those expenses were made with the intent of benefiting the secured creditor, but also to further his goal of selling the industrial building at a price above the secured creditor's lien. An evidentiary hearing

was held and the bankruptcy court allowed the surcharge. The secured creditor, Southwest, appealed.

28. On appeal, Southwest maintained that Section 506(c) is limited to expenses incurred by the trustee with a specific and exclusive intent to benefit the secured creditor. Although the 5th Circuit rejected this "forward looking" approach, it also confirmed that no inequity results when the estate bears the burden of general administrative costs which only incidentally benefit a secured creditor. *Id. at* 696. Further, to the extent a trustee holds an asset longer than necessary to determine and realize its value, and the value turns out to be less than the creditor's secured interest, the creditor can challenge the necessity of the costs incurred by the trustee.

29. In the present case, the expenses Debtor seeks to now surcharge were used towards operational issues which were in large part present <u>prior to the time Debtor filed for bankruptcy</u>. *See* Second Amended Motion, Page 4. Further, certain debts were incurred pre-petition. *Id. at* Page 5-6. As mentioned above, these expenses were paid to make sure patients were provided with proper care, and in an attempt for Debtor to reorganize and continue operations at the Hospital. Any benefit to b1 Bank was incidental. In contrast, in *Domistyle*, the trustee specifically testified that expenses were made to preserve the collateral he intended to market.

30. Further, Debtor's attempt to surcharge professional fees is entirely improper. In determining whether to surcharge an expense, care must be taken to distinguish expenses that truly contribute to the preservation or enhancement of the secured creditor's position, and those that have no such effect. Examples of the latter include professional fees incurred in challenging the secured creditor's security interest. *See, e.g., General Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.), 739 F.2d 73, 10 C.B.C.2d 1309, 1312–13 (2d Cir. 1984)*; *In re Westwood Plaza Apartments, Ltd., 154 B.R. 916, 922 (Bankr. E.D. Tex. 1993)* (disallowing

recovery of costs for services of debtor's attorneys that were incurred primarily to assist debtor to reorganize and maintain its property); *In re Kero-Sun, Inc., 58 B.R. 770 (Bankr. D. Conn. 1986)*; *In re Bohne, 57 B.R. 461 (Bankr. D.N.D. 1985)*; *In re Vantex Land & Dev. Co., 47 B.R. 261, 263 (Bankr. D. Ariz. 1985)*.

31.     Therefore, it is clear that again, Debtor has not met their burden as to this element.

## II.     Debtor's attempt to artificially and unilaterally limit b1 Bank's credit bid is inappropriate and eviscerates the purpose of a credit bid.

32.     It is well settled law that a credit bid is specifically designed to allow a creditor to credit bid on its collateral up to the value of the creditor's claim without regard or limitation as to the actual value of the collateral. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys.Corp.)*, 432 F.3d at 460 (3d Cir. 2006).  The Court in *Submicron* addressed the very argument that Debtor is attempting to make in this case. The Court, in addressing the debtor's attempt to cap the credit bid based on value of the collateral, noted the absurdity of the argument and stated:

> In fact, logic demands that § 363(k) be interpreted in this way; interpreting it to cap credit bids at the economic value of the underlying collateral is theoretically nonsensical.
>
> A hypothetical is illustrative.
>
>> Assume that Debtor has a single asset: a truck, T. Lender is a secured creditor that has loaned Debtor $ 15, taking a security interest in T. Debtor is in Chapter 11 bankruptcy and has filed a § 363 motion to sell T to Bidder for $ 10. Debtor argues that Lender can only credit bid $ 10 for T and must bid any excess in cash if it wishes to outbid B.
>>
>> This hypothetical reveals the logical problem with an actual value bid cap. If Lender bids $ 12 for T, by definition $ 12 *becomes* the value of Lender's security interest in T. In this way, until Lender is paid in full, Lender can always overbid Bidder. (Naturally, Lender will not outbid Bidder unless Lender believes it could generate a greater return on T than the return for Lender represented by Bidder's offer.) As Lender holds a security interest in T, any amount bid for it up to the value of Lender's full claim becomes the secured portion of Lender's claim by definition. Given the weight of reason's demand that "it must be so," we see no reason to catalog the myriad other arguments that have been advanced to support this "interpretation."

*Id.* at 460.

Moreover, the Court in *Submicron* went further to show that the debtor's attempt to value the claim under 11 USC §506 prior to an auction was unnecessary and absolutely nonsensical.

> **...** as a practical matter, no § 506 valuation is required before a § 363 sale of the underlying collateral can be approved. Section 363 attempts to *avoid* the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price. The provision is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth. Naturally, then, courts are not required first to determine the assets' worth before approving such a market sale. This would contravene the basis for the provision's very existence.

*Id.* at 461.

Other courts echo this well-settled reasoning.

> A credit bid allows the holder of claim to "offset [their] claim against the purchase price of such property." 11 U.S.C. § 363(k). **The statute "enables the creditor to purchase the collateral for what it considers the fair market price (<u>up to the amount of its security interest</u>) without committing additional cash to protect the loan."** *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n.2, 132 S. Ct. 2065, 182 L.Ed.2d 967 (2012). The "credit bid provides a weapon for a secured creditor who is dissatisfied with a potential sales price to increase the bid to what it deems to be fair market value, thereby protecting the benefit of its bargain." *In re Phila. Newspapers, LLC*, 418 B.R. 548, 563 (E.D. Pa. 2009), aff'd, 599 F.3d 298 (3rd Cir. 2010).

*In re RE Palm Springs II, LLC*, No. 3:20-CV-3486-B, 2021 U.S. Dist. LEXIS 219823, *28-29 (N.D. Tex. Nov. 15, 2021) (Boyle, J.) (emphasis added), *aff'd*, 65 F.4th 752 (5th Cir. 2023).[5]

33.     With respect to credit bidding, the Supreme Court has recognized that "[t]he ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a

---

[5] *See In re Phila. Newspapers, LLC*, 599 F.3d 298, 320 (3rd Cir. 2010) (Ambro, J., dissenting) ("What typically occurs is that, if there are no other bidders, the secured lenders get the assets rather than the Stalking Horse Bidder (unless, of course, the Stalking Horse Bidder increases its bid to a number that is the secured lenders' "reservation price," *i.e.*, the price they are willing to have the Stalking Horse pay cash that will essentially be transferred to them). If credit bidding is denied, however, the debtors' insiders stand to benefit by having more leverage to steer the sale to a favored purchaser (here, the Stalking Horse Bidder). This is exactly what is being attempted in this case.

depressed price[]" by "enabl[ing] the [secured] creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan." *RadLax Gateway Hotel*, 566 U.S. at 644, 132 S. Ct. at 2070 n.2. Credit bidding "allows the secured creditor to bid for its collateral using the debt it is owed to offset the purchase price [,]" which "ensures that, if the bidding at the sale is less than the amount of the claim the collateral secures, the secured creditor can, if it chooses, bid up the price to as high as the amount of its claim." *Quality Props. Asset Mgmt. Co. v. Trump Va. Acquisitions, LLC*, No. 3:11-CV-00053, 2012 U.S. Dist. LEXIS 115225, *7 n.14 (W.D. Va. Aug. 16, 2012). A secured creditor's purchase of assets, that are subject to its lien, by credit bid "is the equivalent of a cash purchase." *In re Spillman Development Group, Ltd.*, 401 B.R. 240, 253 (Bankr. W.D. Tex. 2009) (citations omitted); *see In re HNRC Dissolution Co.*, 340 B.R. 818, 824-25 (Bankr. E.D. Ky. 2006). As observed by the court in *Lexington Coal*, "[c]learly 11 U.S.C. § 363(k) treats credit bids as a method of payment – the same as if the secured creditor has paid cash and then immediately reclaimed that cash in payment of the secured debt." *Lexington Coal*, 340 B.R. at 824-25.

34. Here, Debtor is trying to have its cake and eat it too by holding an auction, but also attempting to hold a pre-auction § 506 valuation hearing via motion in order to steer the collateral to its preferred bidder, the Plan Sponsor. The Debtor can't have both. The Debtor realizes this fact and thus the nonsensical arguments. If this were a reorganization (with a § 506 valuation issue) and not a sale of the assets via auction, b1 Bank could make the 1111(b) election to protect against a depressed value. The Debtor, knowing this, elected to sell its assets, but then tries to strip b1 Bank of its protections by proposing some sort of hybrid process that doesn't pass muster.

35. There has been no objection to b1 Bank's secured claim and no legitimate reason to cap b1 Bank's credit bid rights. There is absolutely no reason to unilaterally cap b1 Bank's

credit bid based on the Debtor's alleged value of the collateral being sold. Moreover, Debtor is conflating two distinct concepts. The first concept is that a secured lender is entitled to proceeds up to the value of its collateral. In an auction setting, that value is determined by the auction bids, including a secured lender's credit bid. Debtor somehow attempts to argue that the Plan Sponsor's side-deals with unsecured creditors (some of which alleviate significant personal liability of Debtor's insider, Dr. Baig) and intent to operate the Hospital provides additional value and will "launch the Reorganized Debtor into profitability." *See* Second Amended Motion, Page 15, Paragraph 45. First, the Plan Sponsor's side-deals and future business plans are wholly irrelevant to b1 Bank's ability to credit bid its full claim and irrelevant to b1 bank's collateral. Second, the auction is an asset sale of all (or substantially all) of the Debtor's assets to a third party. There is no "Reorganized Debtor" to consider. Any future profitability of the Hospital and the Plan Sponsor's operations is for the sole benefit of the Plan Sponsor. The Plan Sponsor (or any other bidder) must factor in the costs of the side-deals in addition to the value of b1 Bank's collateral to determine its bid. Plan Sponsor and Debtor cannot somehow embroil the two in an effort to unilaterally and artificially cram down b1 Bank. The Debtor and Plan Sponsor cannot claim that money spent on side-deals somehow entitles the Plan Sponsor to a discount on b1 Bank's collateral. The collateral price is a separate issue from a winning bidder's plans to operate the collateral after the auction. Debtor's position raises an obvious question that renders the Debtor's position untenable; What is the point of allowing a credit bid by a secured lender (which credit bid is designed to protect secured lenders from depressed prices) then capping that credit bid on the Debtor's opinion of the collateral value? The Debtor is essentially trying to hold a valuation hearing in a motion by capping the credit bid to what Debtor asserts is the value. Such a position renders the purpose of the credit bid irrelevant. It also flies in the face of the essence of an auction.

The bidders will determine the value of the collateral being sold, not the Debtor. If b1 Bank (or any other party) elects to bid over the Debtor's asserted value, that is b1 Bank's prerogative. That is indeed the purpose of the credit bid and the auction.

### III. Section 105(c) of the Bankruptcy Code supports b1 Bank's Position

36. Debtor improperly asserts that 11 U.S.C. § 105(a) supports granting the relief sought. *See* Second Amended Motion, Page 20. However, case law is very clear that this provision cannot be used to expand the rights provided for in Section 506(c) of the Bankruptcy Code. *See O'Donnell v. Northwest Airlines (In re Northeast Express Reg'l Airlines),* 228 B.R. 53, 55 Bankr. Ct. Dec. (LRP) 813, 1988 Bankr. LEXIS 1659 (Bankr. D. Me. 1998). Moreover, as set forth above, the equitable arguments in this case do not favor the Debtor's position. Hence, this argument by Debtor also fails.

### IV. Conclusion

37. In conclusion, b1 Bank requests that the Court deny all relief requested by Debtor. Alternatively, b1 Bank requests that the Court specifically analyze each expense and only allow the surcharge as to expenses which were not already paid using b1 Bank's funds, and which actually (not incidentally) benefitted b1 Bank. Further, b1 Bank requests the Court deny any limitation on its credit bid at the auction.

Respectfully submitted,

/s/ *Michael P. Menton*
Michael P. Menton
Texas Bar I.D. 24046427
*mmenton@settlepou.com*
Katherine L. Killingsworth
Texas Bar I.D. 24046208
*kkillingsworth@settlepou.com*

SettlePou
3333 Lee Parkway, Eighth Floor
Dallas, Texas 75219
(214) 520-3300
(214) 526-4145 (Facsimile)

ATTORNEYS FOR B1 BANK

## Certificate of Service

A true and correct copy of the foregoing document was served in accordance with the Federal Rules of Procedure and Federal Rules of Bankruptcy Procedure on October 24, 2025, on the persons/entities identified on the attached service list.

/s/ *Michael P. Menton*
Michael P. Menton

Michael P. Menton
Texas Bar I.D. 24046427
Katherine Killingsworth
Texas Bar I.D. 24046208
SettlePou
3333 Lee Parkway, Eighth Floor
Dallas, Texas 75219
(214) 520-3300
(214) 526-4145 (Facsimile)

ATTORNEYS FOR B1BANK

THE UNITED STATES BANKRUPTCY COURT
IN THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 25-90012 |
| PLATINUM HEIGHTS, LP | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |

# SERVICE LIST
(Via U.S. Mail, First Class, Postage Prepaid, Facsimile or Electronically if a Registered ECF User)

| | | |
|---|---|---|
| Platinum Heights, LP<br>1917 Ashland Street<br>Houston, TX 77008 | Omar Jesus Alaniz<br>Reed Smith, LLP<br>2850 N. Harwood St., Suite 1500<br>Dallas, TX 75201 | U.S. Trustee<br>515 Rusk Ave., Suite 3516<br>Houston, TX 77002 |
| Christopher Ross Travis<br>Jana Smith Whitworth<br>Office of the U.S. Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Susan Fuertes<br>Assistant County Attorney<br>Harris County Attorney's Office<br>Attn: Property Tax Division<br>P.O. Box 2848<br>Houston, TX 77252 | Jeannie L. Andersen<br>Linebarger Goggan Blair &<br>Sampson, LLP<br>P.O. Box 3064<br>Houston, TX 77253-3064 |