IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: § | |
| § | Case No. 25-90012 (ARP) |
| PLATINUM HEIGHTS, LP, § | |
| § | Chapter 11 |
| Debtor. § | |
| § | |

**OBJECTION AND RESERVATION OF RIGHTS OF CURAHEALTH HOUSTON HEIGHTS, LLC D/B/A PAM HEALTH REHABILITATION HOSPITAL OF HOUSTON HEIGHTS TO THE DEBTOR'S SCHEDULE OF ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND RELATED CURE AMOUNTS**
[RELATES TO DKT. NO. 203-3]

Curahealth Houston Heights, LLC d/b/a PAM Health Rehabilitation Hospital of Houston Heights ("PAM Health") files this *Objection and Reservation of Rights* (the "Objection") to the Debtor's *Schedule of Assumed Executory Contracts and Unexpired Leases and Related Cure Amounts* (the "Assumption Schedule") [Dkt. No. 203-3].[1] In support of this Objection, PAM Health respectfully states as follows:

## BACKGROUND

A.  **Overview of PAM Health and PAM Health's History with the Debtor**

1.  Founded in 2006, PAM Health is a healthcare provider that operates 70+ hospitals across the U.S. that provide post-acute care, recovery, and empowerment for various conditions. PAM Health is committed to providing high-quality patient care and outstanding customer service, coupled with loyal, dedicated, and highly trained staff to be the most trusted and impactful source for healthcare in every community it serves.

---

[1] PAM Health's deadline to object to the Assumption Schedule was extended by agreement to December 3, 2025, at 12:00 pm (Central Time). Discussions among the Debtor, PAM Health, and the Plan Sponsor are ongoing. If a resolution cannot be reached, the parties have agreed to seek a setting from this Court for the week of December 15th, subject to the Court's availability.

1

2. One such community PAM Health serves is Houston, Texas, as PAM Health operates an inpatient rehabilitation hospital located at Heights Hospital, pursuant to a certain *Lease Agreement*, dated July 21, 2018 (as amended, the "Lease"),[2] between Curahealth Houston Heights, LLC d/b/a PAM Health Rehabilitation Hospital of Houston Heights (as Tenant), and Platinum Heights, LP (the "Debtor") (as Landlord and as successor in interest to 1917 Heights Hospital LLC).

3. The commencement of the original Lease was conditioned on an affiliate of the Landlord obtaining a hospital license from the Texas Department of Health and Human Services (*see* Ex. 1 (Lease) at p. i, "Lease Commencement Date"). Similarly, the "Permitted Use" of the Premises was intended for "[m]edical-surgical hospital and ancillary uses related to a medical-surgical hospital." (*see id.* at p. ii, "Permitted Use"). To this point, the Lease provides that "***Tenant shall continuously occupy and use the Premises only for the Permitted Use and shall comply with all Laws relating to the use, condition, access to, and occupancy of the Premises* . . . .***" See *id.* at § 10, "Use; Required Status") (emphasis added). The Lease further provides that "Tenant represents that it is (and, at all times during the Term, will be) licensed to conduct the business contemplated and carried on in the Premises and that Tenant shall maintain at all times, at Tenant's sole cost, all requisite permits and licenses", and that "[n]otwithstanding Tenant's obligations . . . , ***Landlord shall cause the Premises to be delivered to the Tenant as of the Lease Commencement Date in compliance with all applicable Laws . . . related to the general use of the Building . . . .***" *Id.* (emphasis added).

---

[2] The Lease has been amended on several occasions, including pursuant to that certain *First Amendment to Lease Agreement* dated August 15, 2018, the *Second Amendment to Lease Agreement* dated August 30, 2018, the *Third Amendment to Lease Agreement* dated April 2, 2019, and the *Fourth Amendment to Lease Agreement* dated October 27, 2018. The Lease, which is incorporated herein by reference for all purposes, contains confidentiality provisions and therefore is not attached hereto given that the Debtor already has a copy of the Lease.

4. As part of the Lease, the Landlord is responsible for maintaining the "Building's Systems" consistent with the Permitted Use of the Lease. "Building's Systems" means the Building's HVAC, life-safety, plumbing, electrical, and mechanical systems. *Id.* at § 1; *see e.g., id.* at § 8(f) (requiring Landlord provide HVAC 24 hours per day 7 days a week), § 9(c) (requiring that Landlord "shall maintain in a good state of repair . . . mechanical, electrical, plumbing, elevators, parking lot and HVAC"); § 9(a) (providing that Landlord may withhold consent to any alterations/additions that adversely affect the Building's Systems); § 9(h) (providing that any work performed by Tenant shall not damage the Building's Systems).

5. In exchange for occupancy of the Premises, PAM Health pays the Debtor both "Basic Rent" and "Additional Rent" on a monthly basis. "Additional Rent" refers to PAM Health's proportionate share of various "Operating Costs", which accounts for, among other things, "all general and special assessments, levies, permits, *inspection and license fees* on or with respect to the Project; all water and sewer rents and other utility charges on or with respect to the Project; *and all other public charges* and/or taxes whether of a like or different nature, even if unforeseen or extraordinary, *imposed or assessed upon or with respect to the Project against Landlord, Tenant or any of the Project as a result of or arising in respect of the occupancy, leasing, use, maintenance, operation, management, repair or possession thereof*, or any activity conducted on or about the Project . . . ." *See id.* at § 4(c)(1), "Additional Rent") (emphasis added). Thus, while the Landlord is responsible for, among other things, the maintenance, operation, management and repair of the Premises, the Tenant pays a proportionate share of such Operating Costs as part of its monthly rent. PAM Health has fully and timely paid all such monthly rental obligations.

6. "Operating Costs" is further defined to include, among other things, "all expenses and disbursements that either Landlord or Tenant incurs in connection with the ownership, lease,

3

operation, ***and maintenance of the Project***, . . . including the following costs: . . . (B) all supplies and materials used in the operation, ***maintenance, repair***, replacement, and security of the Project; (C) costs for . . . other improvements made to the Project which, although capital in nature (but not replacement) or other improvements made to the Project which, although capital in nature, are expected to reduce the operating costs . . . of the Project . . . ; (F) ***non-capital repairs, replacements, and general maintenance of the Project***; and (G) service, maintenance and management contracts with independent contractors for the ***operation, maintenance, management, repair, replacement, or security of the Project (including*** alarm service, window cleaning, ***and elevator maintenance***).": *See id.* at § 4(c)(2), "Operating Costs") (emphasis added).[3]

7. The Lease makes clear that (a) "Tenant shall not use or permit the use of the Premises, or any part thereof, for any purpose other than for Tenant's intended use thereof. . . ." (*see id.* at § 8(a), "Tenant Obligations"),[4] and (b) "Tenant shall, as soon as reasonably practicable, notify Landlord of any condition on any portion of the Premises, Building, or Project requiring repair and/or maintenance which the Landlord is obligated to complete and perform." *Id.* at § 8(e), "Tenant Obligations").

8. Similarly, as to the Landlord, the Landlord is required to provide certain HVAC, water, janitorial, electrical and elevator services, which "***Landlord shall provide the services referred at a level substantially similar to the level of service and maintenance that is typical in other similar class medical office buildings located in the metropolitan area in which the Building is located***." *Id.* at § 8(f), "Landlord Obligations") (emphasis added). The Landlord is

---

[3] Additionally, by April 1 of each calendar year, the Landlord is required to furnish to the Tenant a statement of Operating Costs for the previous year, and Landlord is required to make available to Tenant "all records of Landlord relating to Tenant's Proportionate Share of Operating Costs." *See id.* at § 4(c)(5).

[4] The Lease further provides that "[a]ll portions of the Premises used for examination, diagnosis, testing or therapy . . . shall at all times comply with Law." *See id.* at § 9(a), "Improvements; Alterations").

4

also required to "maintain the common areas of the Building and the Project in reasonably good working order and condition throughout the Term of the Lease. . . ." *Id.* To this point, it is the Landlord's right "to make inspections, repairs, alterations, additions, changes, or improvements . . . in and about the Project, or any part thereof. . . ." *Id.* at § 23(a).

9. Lastly, the Lease provides that "Tenant shall comply with the rules and regulations of the Project which are attached . . . as Exhibit C [to the Lease]" (*id.* at § 13, "Rules and Regulations"), and that "Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance from Landlord . . . , subject to the terms and conditions of this Lease." *Id.* as § 25(h).

10. Taken together, the forgoing provisions boil down to one fundamental premise: the Debtor, as Landlord, is obligated to ensure that the Building and Premises (including the Building's Systems) meet all legal and regulatory requirements for the Permitted Use, and the failure to maintain the Building, Premises, and/or the Building's Systems and to provide related reports and information to PAM Health sufficient for PAM Health to meet and maintain its licensing requirements directly impacts the manner and ability in which PAM Health can operate, and thus the Permitted Use of the Premises. Landlord's failure to comply with these Lease provisions could result in the PAM Health's inability to operate the Premises in accordance with the Permitted Use, which is an entire frustration of the Lease and deprives PAM Health of its benefits under the Lease.

B.  **The Debtor Breaches the Lease Pre-Petition**

11. Notwithstanding the terms of the Lease and the Debtor's obligations thereunder to provide the Premises to PAM Health for its Permitted Use, on December 26, 2024, PAM Health

5

sent a letter notifying the Debtor that it was in breach[5] under the Lease for failing to provide certain Building System Reports (the "December 26th Letter")—namely, fire inspection reports and medical gas reports.[6] PAM Health, through the December 26th Letter, put the Debtor on notice that PAM Health was treating the Debtor's failure to provide such reports as a breach of the Lease.

12. The December 26th Letter also informed the Debtor that PAM Health was in the window of receiving its accreditation survey, meaning that surveyors could come into the hospital unannounced any day to inspect the premises and PAM Health's operations. As part of this survey process, PAM Health is obligated to provide copies of various Building System Reports as a "Condition of Participation" to the surveyors. In the absence of providing this information to the surveyors, PAM Health could be cited, PAM Health could lose accreditation status for Medicare participation, and PAM Health could possibly face fines. Putting aside the fact that the absence of these reports directly impacts the Permitted Use of the Premises, without those various Building System Reports, PAM Health does not know the condition of the Building's Systems to be able to assess risks for PAM Health's rehabilitation patients.

C. **The Debtor Files for Bankruptcy and Acknowledges Various Operational Issues Impacting the Building and the Permitted Use Under the Lease**

13. On February 20, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing this chapter 11 case in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

---

[5] While the Lease does not provide a definition of what constitutes a "default" by the Landlord, the Lease acknowledges that such defaults can occur. *See* Lease § 25(b) (discussing the liability of Landlord "for any default by Landlord under the terms of this Lease . . . ."). In the absence of a defined term in the lease, state law governs. *See In re Hawkeye Ent., LLC*, 49 F. 4th 1232, 1238 (9th Cir. 2002) (applying state law construing the term "default" consistent with its general dictionary definition where the lease itself did not define default).

[6] A true and correct copy of the December 26, 2024 letter is attached hereto as **Exhibit 1**, and is incorporated herein by reference for all purposes.

14. In filings made with the Court, the Debtor acknowledged many of the issues that existed under the Lease pre- and post-petition:

- "Maintaining operations at the Hospital has been an arduous process."[7]

- Notwithstanding that "White Rock Medical Center is not a Houston hospital operator" (*id.* at ¶ 14), "White Rock Medical Center ("White Rock"), assumed operational management responsibilities over the Hospital. These management responsibilities included, among other things: (i) maintaining active licenses for Medicare and Medicaid, (ii) preserving clinical continuity in the Hospital and ensuring patient safety, [and] (iii) managing employees, equipment and vendor contracts. . . ." *Id.* at ¶ 13.

- ". . . [I]nstead of offering the typical suite of services, White Rock has focused on operational efficiencies through core statutory and regulatory compliance, regulatory maintenance and asset stabilization to bring the Hospital as close to revenue generating as possible." *Id.* at ¶ 14.

- "[O]perational losses between the Debtor, White Rock and affiliate NCP Management are approximately $400,000 per month. This monthly shortfall is attributable to among other things, funding ongoing operations and the Hospital, ensuring regulatory compliance, responding to and preparing for routine and statutory audits and the like." *Id.* at ¶ 15.

- "Among other things, the Debtor's HVAC owner threatened to remove the Hospital's "chiller"- a large scale cooling system - for prepetition past due amounts. The effect of this removal would have been catastrophic. Without a chiller the Debtor would have no choice but to cease operations and shut down the hospital. The Debtor's lease agreement is with an intermediary, which complicated the Debtor's options." *Id.* at ¶ 17.

- "After the Petition Date, another of the Debtor's critical vendors, ChemAqua, threated to discontinue services because of past-due amounts. ChemAqua is the only vendor able to perform the water testing necessary for the Debtor's protocol compliance with the City of Houston related to the legionella testing. Were ChemAqua not convinced to maintain services, the Debtor would have no manageable way of complying with its reporting requirements. Failure to adhere to these requirements would have resulted in additional costs and litigation at best, and cessation of operations at worst." *Id.* at ¶ 18.

---

[7] *See Declaration of Dr. Mirza Baig in Support of Debtor's Second Amended Surcharge Motion* [Dkt. No. 181], at ¶ 13.

- "[T]he Debtor also spent significant time and effort on plumbing and HVAC repairs. . . . The Debtor's repairs included replacing and fixing domestic water pumps to address issues with water pressure on certain floors of the Hospital, fixing a leak that impacted the space leased to PAM, replacing sump pumps, remediating flooding in the basement, and retaining vendor Facilities Mechanical to troubleshoot the Hospital's pneumatic system." *Id.* at ¶ 19.

- "Prior to the bankruptcy filing, the Debtor and Amtech Elevator Services ("Amtech") entered into agreements to modernize elevators and to service the elevators. The Debtor fell behind on payments owed to Amtech prior to the bankruptcy. . . . Amtech ceased work on the elevator repairs . . . As of the date hereof, there are now three functioning elevators in the Property. Work on the remaining elevators will resume if Amtech's agreements are assumed and cured." *Id.* at ¶ 10.

15. PAM Health is cognizant of the Debtor's financial struggles and limited liquidity that have permeated this chapter 11 case; nonetheless, the Debtor (and Plan Sponsor as defined in the Debtor's proposed plan of reorganization) must understand that PAM Health operates a hospital and that robbing Peter to pay Paul (as has been done throughout this case in terms of putting out one fire at a time while others fester) is not a long term solution, and certainly not one that is contemplated under the Lease or that can continue without putting patient health, safety, and care at risk.

16. Additionally, while certain of the issues previously raised by PAM Health have been remedied, others remain open and outstanding. Indeed, on September 9-10, 2025, as PAM Health had been warning the Debtor for months, an accreditation survey was conducted at the hospital by the Center for Improvement in Healthcare Quality.[8] As a result of this survey activity,

---

[8] Accreditation by the Center for Improvement in Healthcare Quality ("CIHQ") means a hospital has undergone an independent survey to verify compliance with nationally recognized standards of patient safety, quality, and regulatory requirements. CIHQ is approved by the Centers for Medicare & Medicaid Services ("CMS") to grant "deemed status," allowing accredited hospitals to participate in Medicare and Medicaid.

various "condition-level deficiencies"[9] were identified. The condition-level deficiencies primarily relate to "managing the care environment"; and certain condition-level deficiencies were identified as "immediate jeopardy or condition level deficiencies under the Medicare Conditions of Participation." Among others, the condition-level deficiencies included violations of the codes and standards of the National Fire Protection Association ("NFPA") regarding the testing of emergency power systems and the inspection and testing of life safety systems.

17. The survey's identification of the condition level deficiencies required PAM Health to submit a "corrective action plan ("CAP").[10] That CAP was required to be completed and returned to the CIHQ within 10 calendar days from the date of the report (*i.e.* by September 29, 2025). PAM Health timely submitted the CAP.

18. Additionally, the Survey Notice stated that because condition-level deficiencies were identified during the survey, an unannounced follow-up survey would occur within the next 45 days in accordance with CMS/CIHQ requirements. That follow up survey occurred on October 16, 2025. PAM Health received deemed status approval with clearance of all condition-level deficiencies. The Debtor completed only one condition-level deficiency; PAM Health had no choice but to complete the balance.[11]

19. Following receipt of the Survey Notice and after providing the Debtor with a copy of the identified condition-level deficiencies, PAM Health provided the Debtor with two spreadsheets: the *first*, a spreadsheet identifying all of the outstanding inspection, testing and

---

[9] A "condition-level deficiency" refers to a deficiency that substantially limits a provider's or supplier's capacity to furnish adequate care or adversely affects the health or safety of patients. It indicates non-compliance with one or more condition-level requirements, which are essential for ensuring quality care.

[10] A true and correct copy of excerpts from the *Notification of Accreditation Survey Results* (the "Survey Notice") is attached here as **Exhibit 2**, and is incorporated herein by reference for all purposes.

[11] PAM Health reserves all rights in this respect to assert any additional cure claims and other amounts resulting from these corrective actions.

maintenance documents that PAM Health needs from a life safety perspective (together with citations to the various applicable regulatory codes and standards implicated and frequency of such inspections, testing and maintenance); and *second*, a "master cross walk sheet" identifying various ongoing building issues needing repair (again, with citations to the relevant regulatory standards and code provisions).[12]

20. All of this work and documentation is needed to fully and safely operate a "[m]edical-surgical hospital and [other] ancillary uses related to a medical-surgical hospital." (*i.e.*, the Permitted Use of the Premises). Moreover, the various Lease provisions referenced above obligate the Debtor to conduct the work and/or provide documentation in order for the deficiencies to be resolved and to allow PAM Health to safely operate the Premises in accordance with the terms of the Lease and other applicable law and regulations. As of the date hereof, the Debtor has not yet substantively responded to any of these information and building maintenance requests; thus, there are numerous ongoing non-monetary defaults occurring under the Lease. Frankly, PAM Health has received no assurances that the Premises and Building will be suitable for the use of a hospital.

**D.  The Debtor's Proposed Schedule of Assumed Executory Contracts and Unexpired Leases and Related Cure Amounts**

21. On November 14, 2025, the Debtor filed its *Plan Supplement for First Amended Plan of Reorganization of Debtor Platinum Heights, LP* (the "Plan Supplement") [Dkt. No. 203]. Exhibit 3 to the Plan Supplement included the Debtor's Assumption Schedule which lists the Lease as an agreement that will be assumed and assigned to the Plan Sponsor, and includes a $0.00 cure

---

[12] A true and correct copy of the Regulatory Compliance Worksheet and Master Cross Walk Sheet that were provided to the Debtor on October 29, 2025 and November 14, 2025 are attached hereto as **Exhibits 3 & 4**, and are incorporated herein by reference for all purposes.

amount. The Assumption Schedule does not identify any non-monetary defaults that must be cured prior to or in connection with any such assumption and assignment.

## OBJECTION

**A.     The Debtor Must Assume and Cure the Lease in Its Entirety, Including All Non-Monetary Obligations**

22.     Under section 365(b)(1) of the Bankruptcy Code, if a debtor chooses to assume an unexpired lease where there has been a default, it must do three things: (1) cure or provide adequate assurance that it will promptly cure all monetary and most non-monetary defaults, (2) compensate, or provide adequate assurance that it will promptly compensate, the non-debtor party to the lease for any actual pecuniary losses related to the default, and (3) provide adequate assurance of future performance under the lease. *See* 11 U.S.C. § 365(b)(1); *In re Bourbon Saloon, Inc.*, 647 Fed. Appx. 342, 344-45 (5th Cir. 2016).

23.     Section 365(b)(1)(A) provides that if a nonmonetary "default arises from a failure to operate in accordance with a nonresidential real property lease, then ***such default shall be cured by performance at and after the time of assumption in accordance with such lease*** . . . ." 11 U.S.C. § 365(b)(1)(A); *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 797 (Bankr. W.D. Tex. 2013) (emphasis added). When non-monetary defaults are ongoing at the time of assumption, such defaults must be cured in order for the lease to be assumed. *Patriot Place, Ltd.*, 486 B.R. at 797. "[T]he Bankruptcy Code does not require that a 'default' as that term is used in section 365(b)(1), be 'material.'" *In re Hawkeye Ent., LLC*, 49 F.4th 1232, 1239 (9th Cir. 2022) (citing *In re Senior Care Ctrs., LLC*, 607 B.R. 580, 588 (Bankr. N.D. Tex. 2019) for the proposition that materiality is not a factor for purposes of section 365(b)(1)).

24.     The Debtor bears the burden of showing that the requirements for assumption under section 365 have been met. *In re Texas Health Enterprises Inc.*, 72 Fed.Appx. 122, 126 (5th Cir.

2003); *In re M. Fine Lumber Co., Inc.*, 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008); *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 795 (Bankr. W.D. Tex. 2013).

**B.     The Debtor's Proposed Assumption Schedule Fails to Address (and Cure) Various Defaults Under the Lease**

25.     The Debtor was, pre-petition, and is currently, at the time of the proposed assumption, in default of numerous obligations under the Lease.  Among other things, the Debtor has failed to provide fire inspection and medical gas reports, resulting in a breach of the Debtor's obligation to maintain the Building's Systems and ensure that all inspections are conducted in a timely manner (including providing copies of inspection reports to PAM Health) and has failed to provide documentation of the periodic testing of the generator as a source of emergency power to support patient care.  Furthermore, there are numerous repairs needed to the building, including an elevator that has been out of service for more than one year and inoperable main lobby doors.  These defaults (among others that exist) must be cured prior to the Debtor's assumption and assignment of the Lease.  *See Patriot Place, Ltd.*, 486 B.R. at 797.  The Debtor's ongoing failure to comply with these obligations under the Lease put PAM Health at risk of being unable to operate the hospital in accordance with the Permitted Use and in frustration of the purpose of the Lease.

26.     PAM Health files this Objection not to gain any sort of advantage or leverage—indeed, just the opposite.  PAM Health simply requests that the Debtor fulfill its obligations as Landlord under the Lease as its legally required to do and to provide basic, routine and timely maintenance and repairs to the Building and Premises (some areas of which PAM Health does not even have access to)—or that there are assurances in place to ensure such is timely completed—and to be responsive and provide necessary Building Systems Reports sufficient to ensure that PAM Health maintains its licensing and accreditation.  And perhaps most importantly, all of this

is needed to ensure that PAM Health can continue to the deliver the level of patient care that that PAM Health is known for and that patients expect and deserve.

27. There is nothing extraordinary about the regulatory and maintenance information and requests that PAM Health has been seeking since the outset of this case, and which PAM Health requested again as recently as November 14th. This is all information and work that is required in order for PAM Health to use the Premises, as it contractually bargained for, as a "[m]edical-surgical hospital and [for other] ancillary uses related to a medical-surgical hospital" (*see* Lease at p. ii, "Permitted Use"), and the failure to provide this basic life system safety information to PAM Health and to correct basic Building maintenance and repairs in a timely manner only puts at risk PAM Health's ability to "comply with all Laws relating to the use, condition, access to, and occupancy of the Premises" as its required to do under the Lease.

28. The inability to obtain such basic and standard information for an operating hospital facility is baffling at best, and can only presumably be explained by the Debtor's lack of sufficient on site personnel to handle and address such matters and/or related liquidity constraints.

29. But while PAM Health appreciates that this has been a difficult case due to various litigation with its lender and other parties and resulting financial strain, all of which will hopefully be remedied with the Plan Sponsor's acquisition, the Bankruptcy Code mandates that the Lease be cured in connection with any proposed assumption or assumption and assignment. Notwithstanding that clear black letter requirement, it appears that the Debtor instead wishes to turn a blind eye to the various existing and ongoing breaches in an effort to push forward with its assumption and assignment of the Lease and to foist upon the Plan Sponsor the various issues that it created and that remain outstanding.

30. Simply stated, the various issues described above can and should be addressed now in connection with any assumption and assignment, and the law and various relevant regulatory codes and provisions as identified in the Regulatory Compliance and Master Cross Walk spreadsheets previously provided to the Debtor (and attached hereto as Exhibits 3 and 4) requires it, as does section 365 of the Bankruptcy Code.

## **RESERVATION OF RIGHTS**

31. PAM Health reserves all rights with respect to the Lease, and expressly reserves the right to amend or supplement this Objection at any time prior to any assumption or assignment of the Agreement to assert any additional pre- and post-petition amounts or non-monetary defaults, to object to the assumption and assignment of the Agreement on the grounds of adequate assurance or other grounds, and to assert any further objections as it deems necessary or appropriate.

## **CONCLUSION**

Wherefore, PAM Health respectfully requests that this Court enter an order consistent with the foregoing, and grants such further relief to PAM Health as this Court deems just and equitable.

[*Reminder of Page Intentionally Left Blank*]

Dated: December 1, 2025

        Respectfully submitted,

        **NORTON ROSE FULBRIGHT US LLP**

        */s/ Jason L. Boland*
        Jason L. Boland (SBT 24040542)
        1550 Lamar, Suite 2000
        Houston, Texas 77010
        Telephone: (713) 651-5151
        Facsimile: (713) 651-5246
        Email: jason.boland@nortonrosefulbright.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2025, a true and correct copy of the foregoing document was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter.

        */s/ Jason L. Boland*
        Jason L. Boland