**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PLATINUM HEIGHTS, LP,[1] | § | Case No. 25-90012 (ARP) |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF**
**(A) FINAL APPROVAL OF THE DEBTOR'S DISCLOSURE STATEMENT AND**
**(B) CONFIRMATION OF THE DEBTOR'S PLAN**

---

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is Platinum Heights, LP (4367). The location of the Debtor's corporate headquarters and the Debtor's service address is: 1917 Ashland Street, Houston, Texas 77008.

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................i

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND ..............................................................................................................2

I.     Debtor Information ..................................................................................................2

II.    The Plan Confirmation Process ............................................................................3

       A.    Summary of the Plan.................................................................................5

             1.    Sale Transaction ..........................................................................5

             2.    CLS Settlement ...........................................................................5

             3.    REILS Settlement ........................................................................6

             4.    Secured Lender Settlement ..........................................................6

III.   Voting Results....................................................................................................10

ARGUMENT ..................................................................................................................11

I.     The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtor Satisfied the Applicable Notice Requirements.................................................................................................11

       A.    The Disclosure Statement Contains Adequate Information...................11

       B.    The Debtor Complied with the Applicable Notice Requirements .........13

       C.    The Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith ...........................................................................................13

II.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code ...............14

       A.    Section 1129(a)(1): Plan Compliance with Bankruptcy Code Provisions............14

             1.    The Plan Complies with Section 1122 of the Bankruptcy Code ...............14

             2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a)(1)–(7) of the Bankruptcy Code .....................................16

                  a.    The Plan Properly Describes Each Class of Claims and Its Treatment (Section 1123(a)(1)–(3)).................................. 16

                  b.    The Plan Provides the Same Treatment Within Each Class (Section 1123(a)(4))................................................ 16

                  c.    The Plan Provides Adequate Means for Its Implementation (Section 1123(a)(5))................................................ 17

                  d.    The Plan Does Not Create Nonvoting Equity Securities (Section 1123(a)(6))................................................ 17

e.      The Plan's Provisions for Selecting Directors and Officers Are Consistent with Stakeholders' Interests and Public Policy (Section 1123(a)(7)) ............................................................ 17

3.     The Plan's Discretionary Contents Comply with Section 1123(b) of the Bankruptcy Code ............................................................... 18

a.      The Debtor's Releases are Appropriate, in the Bests Interest of the Debtor's Constituents, and Should be Approved ................... 18

b.      The Third-Party Releases are Consensual, Appropriate, and Comply with the Bankruptcy Code ............................................. 20

c.      The Plan's Exculpation Provision Is Appropriate ....................... 22

d.      The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained in the Plan ...................................... 24

e.      Assumption and Rejection of Executory Contracts and Unexpired Leases (Section 1123(b)(2)) ...................................... 24

B.    Section 1129(a)(2): Debtor's Compliance with the Bankruptcy Code ................ 25

1.     Section 1125: Post-Petition Disclosure Statement and Solicitation .......... 25

2.     Section 1126: Acceptance of the Plan ....................................... 25

C.    Section 1129(a)(3): Good Faith ............................................... 26

D.    Section 1129(a)(4): Professional Fees Subject to Court Approval ....................... 27

E.    Section 1129(a)(5): Information Regarding Proposed Officers and Managers ............................................................................... 29

F.    Section 1129(a)(6): Inapplicable Provision ......................................... 29

G.    Section 1129(a)(7): Treatment of Holders of Impaired Classes ........................... 29

H.    Section 1129(a)(8): Acceptance by Each Impaired Class of Claims or Interests ............................................................................. 30

I.    Section 1129(a)(9): Payment of Priority Claims ...................................... 31

J.    Section 1129(a)(10): Acceptance by Impaired Classes ................................. 32

K.    Section 1129(a)(11): Feasibility ................................................... 32

L.    Section 1129(a)(12): Payment of U.S. Trustee Fees ................................... 33

M.    Section 1129(a)(13)–(16): Inapplicable Provisions .................................. 34

N.    Section 1129(b): Cramdown of Non-Accepting Classes ............................... 34

1.     The Plan Does Not Discriminate Unfairly .................................. 35

2.     The Plan Is Fair and Equitable ............................................. 36

O.    Section 1129(c): The Plan Is the Only Plan Currently on File ........................... 37

P.      Section 1129(d): The Principal Purpose of the Plan Is Not Avoidance of Taxes .................................................................................................37

Q.      Section 1129(e): Inapplicable Provision .................................................................37

CONCLUSION........................................................................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns. Corp.*,
  361 B.R. 337 (S.D.N.Y. 2007).........................................................................................29

*In re Age Refining, Inc.*,
  801 F.3d 530 (5th Cir. 2015) ..........................................................................................19

*In re Allied Props., LLC*,
  2007 WL 1849017 (Bankr. S.D. Tex. June 25, 2007) ............................................19

*In re Ambanc La Mesa Ltd. P'ship*,
  115 F.3d 650 (9th Cir. 1997) ..........................................................................................35

*In re Aztec Co.*,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) .....................................................................35

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999).................................................................................................29, 36

*In re Bigler LP*,
  442 B.R. 537 (Bankr. S.D. Tex. 2010) .........................................................................18

*In re Block Shim Dev. Co.-Irving*,
  939 F.2d 289 (5th Cir. 1991) ..........................................................................................26

*Boullion v. McClanahan*,
  639 F.2d 213 (5th Cir. 1981) ..........................................................................................22

*In re Bowles*,
  48 B.R. 502 (Bankr. E.D. Va. 1985).............................................................................35

*In re Briscoe Enterprises, Ltd., II*,
  994 F.2d 1160 (5th Cir. 1993) ........................................................................................32

*In re Brotby*,
  303 B.R. 177 (B.A.P. 9th Cir. 2003).............................................................................32

*In re Cajun Elec. Power Co-op., Inc.*,
  119 F.3d 349 (5th Cir. 1997) ..........................................................................................18

*In re Cajun Elec. Power Co-op., Inc.*,
  150 F.3d 503 (5th Cir. 1998) ..........................................................................................27

*In re Chapel Gate Apartments, Ltd.*,
  64 B.R. 569 (Bankr. N.D. Tex. 1986)...........................................................................27

*In re CJ Holding Co.*,
    597 B.R. 597 (S.D. Tex. 2019) ..................................................................20

*Commodity Futures Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985)..................................................................................22

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) ...............................................24, 29, 32

*In re Derosa- Grund*,
    567 B.R. 773 (Bankr. S.D. Tex. 2017) .......................................................18

*In re Divine Ripe, L.L.C.*,
    554 B.R. 395 (Bankr. S.D. Tex. 2016) .......................................................11

*In re Eagle Bus Mfg., Inc.*,
    134 B.R. 584 (Bankr. S.D. Tex. 1991) .......................................................14

*In re Eddington Thread Mfg. Co.*,
    181 B.R. 826 (Bankr. E.D. Pa. 1995) .........................................................32

*FOM Puerto Rico S.E. v. Dr. Barnes EyeCenter Inc.*,
    255 F. App'x 909 (5th Cir. 2007) ...............................................................20

*In re Foster Mortg. Corp.*,
    68 F.3d 914 (5th Cir. 1995) .......................................................................19

*In re Foster*,
    2023 WL 20872 (5th Cir. Jan. 3, 2023) ....................................................22

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ....................................................35

*In re Highland Capital Mgmt., L.P.*,
    48 F.4th 419 (5th Cir. 2022) .....................................................................22

*In re Idearc Inc.*,
    *423* B.R. 138 (Bankr. N.D. Tex. 2009)...............................................19, 35

*In re Jackson Brewing Co.*,
    624 F.2d 599 (5th Cir. 1980) .....................................................................18

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987).....................................................................34

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)..........................................................35

*Kane v. Johns-Manville,*
   843 F.2d 636 (2d Cir. 1988)..................................................................................34

*In re Kolton,*
   1990 WL 87007 (Bankr. W.D. Tex. Apr. 4, 1990)..................................................35

*In re Lakeside Global II, Ltd.,*
   116 B.R. 499 (Bankr. S.D. Tex. 1989) ...................................................................32

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.,*
   354 B.R. 1 (D. Conn. 2006) ...................................................................................32

*In re Metrocraft Pub. Servs., Inc.,*
   39 B.R. 567 (Bankr. N.D. Ga. 1984) ......................................................................12

*In re Mirant Corp.,*
   2005 WL 6443614 (Bankr. N.D. Tex. Dec. 9, 2005) ..............................................14

*In re Mirant Corp.,*
   348 B.R. 725 (Bankr. N.D. Tex. 2006)....................................................................18

*In re Moore,*
   608 F.3d 253 (5th Cir. 2010) .................................................................................19

*In re Phoenix Petroleum Co.,*
   278 B.R. 385 (Bankr. E.D. Pa. 2001) .....................................................................12

*In re Pisces Energy LLC,*
   2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) ............................................14

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
   390 U.S. 414 (1968)...............................................................................................18

*In re PWS Holding Corp.,*
   228 F.3d 224 (3d Cir. 2000)...............................................................................21, 22

*Republic Supply Co. v. Shoaf,*
   815 F.2d 1046 (5th Cir. 1987) ...............................................................................20

*In re Roqumore,*
   393 B.R. 474 (Bankr. S.D. Tex. 2008) ...................................................................19

*In re Sandy Ridge Dev. Corp.,*
   881 F.2d 1346 (5th Cir. 1989) ...............................................................................32

*In re Scioto Valley Mortg. Co.,*
   88 B.R. 168 (Bankr. S.D. Ohio 1988).....................................................................12

*In re Sentry Operating Co. of Tex., Inc.*,
  264 B.R. 850 (Bankr. S.D. Tex. 2001) ...................................................................14

*In re Smith*,
  357 B.R. 60 (Bankr. M.D.N.C. 2007) ....................................................................29

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) ..................................................................................26

*In re T-H New Orleans Ltd. P'ship*,
  116 F.3d 790 (5th Cir. 1997) .............................................................................26, 32

*In re Tex. Extrusion Corp.*,
  844 F.2d 1142 (5th Cir. 1988) ................................................................................11

*In re U.S. Brass Corp.*,
  194 B.R. 420 (Bankr. E.D. Tex. 1996) ...................................................................12

*In re Vill. at Camp Bowie I, L.P.*,
  710 F.3d 239 (5th Cir. 2013) ..................................................................................26

*In re Vitro Asset Corp.*,
  2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013) ............................................14

*In re Voyager Digital Holdings, Inc.*,
  2023 WL 2731737 (S.D.N.Y. Apr. 1, 2023) ...........................................................22

**Statutes**

11 U.S.C. § 101(31) ........................................................................................................28

11 U.S.C. § 157(b)(2)(L) ................................................................................................22

11 U.S.C. § 1122(a) ........................................................................................................14

11 U.S.C. § 1123(a)(5) ....................................................................................................16

11 U.S.C. § 1123(a)(6) ....................................................................................................17

11 U.S.C. § 1123(b)(3)(A) ..............................................................................................18

11 U.S.C. § 1125(b) ........................................................................................................24

11 U.S.C. § 1125(e) ........................................................................................................13

11 U.S.C. § 1126(a) ........................................................................................................25

11 U.S.C. § 1126(c) ....................................................................................................25, 30

11 U.S.C. § 1126(d) ..................................................................................................25

11 U.S.C. § 1126(f) .............................................................................................25, 30

11 U.S.C. § 1129(a)(2) ...........................................................................................24

11 U.S.C. § 1129(a)(3) .......................................................................................22, 26

11 U.S.C. § 1129(a)(4) ...........................................................................................27

11 U.S.C. § 1129(a)(5)(A)(i) ...................................................................................28

11 U.S.C. § 1129(a)(5)(B) ........................................................................................28

11 U.S.C. § 1129(a)(7)(A) .......................................................................................29

11 U.S.C. § 1129(a)(8) ...........................................................................................30

11 U.S.C. § 1129(a)(9) ...........................................................................................30

11 U.S.C. § 1129(a)(11) .....................................................................................31, 32

11 U.S.C. § 1129(a)(12) ..........................................................................................33

11 U.S.C. § 1129(b) ...........................................................................................34, 36

11 U.S.C. § 1129(b)(1) ............................................................................................34

11 U.S.C. § 1129(b)(2)(B)(ii) ...................................................................................36

11 U.S.C. § 1129(b)(2)(C)(ii) ...................................................................................36

**Other Authorities**

H.R. Rep. No. 95-595 (1977).....................................................................................24

The above-captioned debtor and debtor in possession (collectively, the "**Debtor**") submits this memorandum of law (the "**Confirmation Brief**") in support of an order (i) approving, on a final basis, the *Disclosure Statement for the First Amended Plan of Reorganization of Debtor Platinum Heights, LP* [Dkt. No. 189] (as modified, amended, or supplemented from time to time, the "**Disclosure Statement**"), and (ii) confirming the *First Amended Plan of Reorganization of Debtor Platinum Heights, LP, as Modified on November 25, 2025* [Dkt. No. 210] (as modified, amended, or supplemented from time to time, the "**Plan**").[2] In further support of Confirmation of the Plan and final approval of the Disclosure Statement, the Debtor filed the following declarations (collectively, the "**Supporting Declarations**"):

- *Declaration of Mirza N. Baig in Support of Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "**Baig Declaration**");

- *Declaration of Erik White in Support of Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "**White Declaration**");

- *Declaration of Derek Osei-Bonsu Regarding the Solicitation of Votes and Tabulation of Ballots on the First Amended Plan of Reorganization of Platinum Heights, LP, as Modified on November 25, 2025* (the "**Voting Declaration**"); and

- *Affidavit of Service* [Dkt. No. 198] (the "**Solicitation Affidavit**").

## PRELIMINARY STATEMENT

1.      The Plan is the culmination of nearly a year of hard work by the Debtor to address the Debtor's prepetition liabilities and provide a meaningful recovery for the Debtor's creditors. While the Debtor evaluated other restructuring possibilities, the Plan Sponsor proposed a

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable. All references to an Article refer to the applicable article of the Plan unless otherwise specified herein.

restructuring framework that would finance the Debtor's restructuring, purchase substantially all of the Debtor's Assets, and maximize recoveries to creditors.

2.      The Debtor presents this Court with a consensual plan that provides meaningful recoveries to creditors after extensive arm's length negotiations between the Debtor, the Plan Sponsor, and other key stakeholders in this Chapter 11 Case.

3.      The Plan sells substantially all of the Debtor's Assets to the Plan Sponsor and the Sale Transaction proceeds will pay creditor recoveries under the Plan.

4.      The Plan Administrator will make the Plan distributions to creditors.  As of the Effective Date, the Plan Administrator will solely manage the Debtor's affairs, handling the liquidation or abandonment of the Debtor's remaining Assets, settling all post-Effective Date expenses of the Debtor, and winding up of the Debtor's estate.

5.      The Plan represents a significant victory for parties in interest, as evidenced by its consensual nature and the acceptance of the Plan by all classes of creditors entitled to vote.

6.      The Court should approve the Disclosure Statement on a final basis and confirm the Plan for the benefit of the Debtor's Estate and all stakeholders for the reasons set forth herein and based on the evidence presented at the Combined Hearing.

## <u>BACKGROUND</u>

### I.      Debtor Information

7.      On February 20, 2025 (the "***Petition Date***"), the Debtor commenced this case (the "***Chapter 11 Case***") by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its businesses and manage its property and assets as debtor and debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee, examiner, or statutory committee was appointed in this Chapter 11 Case.

8.     The Debtor is a Texas limited partnership. The Debtor's principal real estate asset is a medical professional building referred to as the "Heights Hospital" (the "***Hospital***") located at 1917 Ashland Street, Houston, TX, 77008 (the "***Property***"). The Hospital is a six-story midrise building where medical professionals may provide a variety of medical services to patients.

## II.     The Plan Confirmation Process

9.     Thomas McMahon approached the Debtor in late May 2025 to explore a potential transaction that culminated in the Plan. Under the Plan, the Plan Sponsor pays the Secured Lender $16–$16.7 million—even though the Secured Lender's core collateral is valued at $12.5 million.[3] The Plan also pays trade creditors 25%, pays administrative expenses and priority taxes in full, and funds the Wind Down Reserve. Thomas McMahon, in accordance with the terms of the Plan, designated Strategic Plus Properties – Heights Healthcare, LLC, a Texas limited liability company to serve as the Plan Sponsor under the Plan (such entity, the "***Plan Sponsor***").

10.     On September 5, 2025, the Debtor filed the *Plan of Reorganization of Debtor Platinum Heights, LP* [Dkt. No. 140].  This previous iteration of the Plan was later amended and superseded by the October 6, 2025 filing.  After subsequent negotiations, the Debtor and Secured Lender reached a value maximizing agreement that is embodied in the version of the Plan filed on October 30, 2025, as modified on November 25, 2025.

11.     On October 30, 2025, the Debtor also filed the Disclosure Statement, similarly amending and superseding previous versions.  On October 31, 2025, the Court entered the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing; (II) Conditionally Approving the Disclosure Statement; (III) Establishing a Plan and Disclosure*

---

[3] The Debtor obtained an appraisal dated September 5, 2025 valuing the Debtor's assets at $12.5 million. The Debtor provided the appraisal to the Plan Sponsor and to the Secured Lender during the September 9, 2025, mediation. The appraisal does not include a valuation of the lease guarantee obligations.

*Statement Objection Deadline and Related Procedures; (IV) Approving the Solicitation Procedures; (V) Approving the Combined Notice; and (VI) Granting Related Relief* [Dkt. No. 194] (the "**Solicitation Procedures Order**").   The Solicitation Procedures Order (a) conditionally approved the Disclosure Statement, (b) established solicitation and voting procedures with respect to the Plan (the "**Solicitation Procedures**") and approved the forms of the contents of the Solicitation Packages, (c) established notice and objection procedures with respect to Confirmation of the Plan and final approval of the Disclosure Statement, (d) established November 26, 2025 at 4:00 p.m. CT as the deadline for voting to accept or reject the Plan (the "**Voting Deadline**"), (e) established December 1, 2025 as the deadline for filing objections to approval of the Disclosure Statement and Confirmation of the Plan, and (f) scheduled the Combined Hearing on final approval of the Disclosure Statement and Confirmation of the Plan for December 5, 2025 at 9:00 a.m. CT.

12.     The Debtor distributed copies of the Solicitation Procedures Order, the Plan and Disclosure Statement, the exhibits attached thereto, the applicable form of ballot with voting instructions (each a "**Ballot**"), to the Holders of Claims in Class 2 through Class 5 (collectively, the "**Voting Classes**"). Holders of Claims and Interests in Class 1 and Class 6 (the "**Non-Voting Classes**") were sent copies of the Non-Voting Notice, which informed members of Non-Voting Classes of the deadline and procedures to file objections to approval of the Disclosure Statement and Confirmation of the Plan and the time and date of the Combined Hearing.

13.     On November 14, 2025, the Debtor filed the Plan Supplement in accordance with the Solicitation Procedures Order.  The Plan Supplement contained (a) the designation of the Plan Administrator, (b) the form of the Plan Administrator Agreement, (c) the designation of the Plan Sponsor, (d) the Secured Lender Secured Loan Agreement, (e) the Secured Lender Secured

Promissory Note, (f) the Liquidation Analysis for the Debtor, and (g) the Schedule of Assumed Executory Contracts and Unexpired Leases.

### A.   Summary of the Plan

#### 1.   Sale Transaction

14.     The Plan's primary transaction is the sale of substantially all of the Debtor's Assets to the Plan Sponsor.  The Sale Proceeds and Heights Health Acquisition Consideration fund distributions under the Plan and the costs of this Chapter 11 Case.  Pursuant to the Sale Transaction, the Plan Sponsor shall purchase the Purchased Assets, constituting substantially all of the Debtor's assets, except for Causes of Action owned by the Debtor or its Estate.  The Plan Sponsor will take the Purchased Assets free and clear of all encumbrances other than the Mortgage and the Secured Lender Restructured Secured Loan. Preexisting liens will attach in their respective same priority to the proceeds of the Sale Transaction.

#### 2.   CLS Settlement

15.     The Plan Sponsor's willingness to enter into the transactions under the Plan was contingent on resolution of certain material claims against the Debtor, including the claims of CLS, the Debtor's minority member.  On June 18, 2025, the Plan Sponsor and CLS entered into a non-binding Letter of Intent ("***LOI***") that provides for the resolution of CLS's claims against the Debtor.  The LOI required that the Plan Sponsor execute two additional agreements governing the terms of the go-forward relationship between the Plan Sponsor and CLS: (i) the Heights Health Acquisition Agreement and (ii) the CLS Lease Agreement.

16.     Additionally, the Plan Sponsor agreed to pay CLS $4,750,000 upon the satisfaction of certain contingencies including that the Plan Sponsor (i) is approved as the sponsor of the Plan, (ii) assumes operational control of the Hospital, and (iii) acquires an interest in Heights Healthcare, LLC.  In exchange, CLS agreed to release its claims against the Debtor.

17.     The Plan Sponsor agreed to use commercially reasonable efforts to cause the release of claims against CLS.  The Plan facilitates the agreement between the Plan Sponsor and CLS, NCP Parties, and the DIP Lender. Section 5.17 of the Plan contains releases among CLS, the Debtor, the Plan Sponsor, the DIP Lender and the NCP Parties (in addition to more detail on the CLS Settlement).  The Debtor, CLS, the DIP Lender, and Plan Sponsor believe that the CLS Settlement is a value maximizing transaction that is in the best interest of the Debtor, its Estate and all applicable parties in interest.

### 3.     REILS Settlement

18.     The Plan Sponsor's willingness to enter into the transactions contemplated by the Plan was also contingent on obtaining a controlling minority interest in Heights Healthcare, LLC and to facilitate its ongoing operations.

19.     As part of its negotiations on the acquisition of Heights Healthcare, LLC, the Plan Sponsor agreed to pay REILS an aggregate $10,000,000.00 to fully settle the outstanding obligations of non-Debtor affiliate PH SPE LLC and for a release of the Debtor Guaranty.  The Plan provides for a payment to REILS in Class 3 equal to 20% of the REILS Claim. After distributions under the Plan, the Plan Sponsor will pay REILS an amount necessary to bring REILS recover to $10,000,000.00.  As a final term of the settlement with REILS, mutual releases by and between REILS, the Debtor, the Plan Sponsor, the DIP Lender and the NCP Parties were to be provided under the Plan, the terms of which are embodied in Section 5.18 of the Plan.

### 4.     Secured Lender Settlement

20.     The Secured Lender Settlement was the final necessary piece that permitted the Debtor to present the Plan on a consensual basis. The relationship between the Debtor and Secured Lender has been a primary driver of the Chapter 11 Case. At the time of filing of the previous version of the Plan and Disclosure Statement, the Debtor and Secured Lender disagreed on (i) the

treatment of the Secured Lender's Claim, (ii) the extent to which the Secured Lender should be permitted to credit bid on the Property, and (iii) the extent of any surcharge on the Secured Lender's Claim as a result of the Debtor's preservation of the Secured Lender's Collateral.

21.     On February 28, 2025, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Secured Lender, (III) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 13] (the "**Cash Collateral Motion**"), seeking authority to use Cash Collateral (as defined in the Cash Collateral Motion).  All of the Debtor's Cash (as defined in the Cash Collateral Motion) was encumbered by liens in favor of the Secured Lender.  The Debtor and Secured Lender determined that it was in the best interest of the Debtor's estate to allow the use of Cash Collateral on a consensual basis in accordance with the terms of the orders attached to the Cash Collateral Motion.

22.     The Court entered two interim orders on the Cash Collateral Motion: (i) the *First Interim Order* on March 3, 2025 [Dkt. No. 28] and (ii) the *Second Interim Order* on March 26, 2025 [Dkt. No. 76], permitting the Debtor to use Cash Collateral on a consensual basis.  On April 23, 2025, the Court entered its *Final Order* on the Cash Collateral Motion [Dkt. No. 95], which permitted the Debtor to use its funds to continue the operation of its business.

23.     Over the course of the following months, the Debtor maintained its estate and began discussions with the Plan Sponsor as described herein. Despite reaching agreements with other material stakeholders, the Debtor, Plan Sponsor and Secured Lender were initially unable to reach an agreement.  As the costs of administering the Chapter 11 Case continued to accrue, the Debtor began to explore options to ensure that Estate remained adequately funded and recognize the valuable contributions the Debtor had made to the Secured Lender and its own Estate.

24.     On August 1, 2025, the Debtor filed the *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Surcharge Certain Collateral, (II)Limiting the Extent of B1 Bank's Prepetition Security Interest in the Collateral, and (III) Granting Related Relief* (the "**Surcharge Motion**") [Dkt. No. 128].

25.     Under the Surcharge Motion, the Debtor sought to surcharge the Secured Lender pursuant to section 506(c) of the Bankruptcy Code for $600,000 representing the actual costs of Debtor's efforts in maintaining Heights Hospital and the Real Property for the benefit of the Secured Lender as of August 1, 2025.  The Court set a hearing for August 11, 2025, on the Surcharge Motion, but the hearing was adjourned pending the Mediation between the Debtor, Secured Lender, CLS and others.  Following the Mediation, the Court set an emergency hearing on the Surcharge Motion on September 23, 2025 (the "**Surcharge Hearing**").  On September 16, 2025, the Debtor filed an amended version of the Surcharge Motion [Dkt. No. 143] (the "**Amended Surcharge Motion**") to be heard at the Surcharge Hearing.  On the date of the Surcharge Hearing, the Debtor and Secured Lender filed a stipulation and agreed order [Dkt. No. 153] which among other things adjourned the Surcharge Hearing until such time as requested by the Debtor.  The adjournment of the Surcharge Hearing allowed the Debtor and Secured Lender to continue negotiations while also limiting the administrative burn on the Debtor's estate.

26.     On October 5, 2025, the Debtor filed the *Emergency Motion of Debtor for Entry of Order (I) Approving (A) Credit Bid and Bidding Procedures for Sale of Debtor's Assets, (B) Form of Notices and (C) Notice Procedures, (II) Setting Hearing on Amended Surcharge Motion and (III) Granting Related Relief* [Dkt. No. 158] (the "**Credit Bid and Bidding Procedures Motion**"). The Credit Bid and Bidding Procedures Motion proposed procedures and a timeline to facilitate

the Secured Lender's Credit Bid submission, and the Plan Sponsor's and other interested bidders' ability to overbid the Secured Lender's Credit Bid.

27.      A hearing on the Credit Bid and Bidding Procedures Motion was held on October 7, 2025, continued to October 27, 2025, and then subsequently continued to October 31, 2025. Prior to entry of an order approving the Credit Bid and Bidding Procedures Motion, the Debtor, the Plan Sponsor, and the Secured Lender ultimately reached a settlement (the "***Secured Lender Settlement***") which permitted the Debtor to move forward with a fully consensual plan, the terms of which are embodied in the Plan.  As part of the Secured Lender Settlement, the Debtor will pay the Secured Lender $200,000.00 on or before the Confirmation Date. Furthermore, in connection with the financing of the Sale Transaction and the purchase of the Purchased Assets, the Plan Sponsor and the Secured Lender will execute the Secured Lender Restructured Secured Loan. The principal amount of the Secured Lender Restructured Secured Loan will be $25,500,000.00, the terms of which are governed by the Secured Lender Restructured Loan Agreement and the Secured Lender Restructured Promissory Note, the form of which are included in the Plan Supplement. Finally, as part of the Secured Lender Settlement, the DIP Lender and Debtor agreed that upon the Effective Date, the DIP Claims will be deemed waived and no distributions in respect thereof will be made through the Plan.

28.      The Debtor, Plan Sponsor and Secured Lender believe that the Secured Lender Settlement is a value maximizing transaction that is in the best interest of the Debtor, its Estate, and all parties in interest.  Rather than engage in value destroying litigation the Secured Lender Settlement allows these parties to move forward consensually, bringing additional certainty to the Chapter 11 Case, reducing administrative waste and promoting judicial economy.

III.     **Voting Results**

29.     In accordance with the Solicitation Procedures Order, on December 1, 2025 the Debtor filed the Voting Declaration which included the certified results of the votes to accept or reject the Plan.  As set forth in the Voting Declaration, Reed Smith as counsel to the Debtor, tabulated the Ballots received by the Voting Deadline from Holders of Claims in the Voting Classes. Based on the results of the voting tabulation, all of the Voting Classes accepted the Plan. As of the Voting Deadline, there were no Holders of Allowed Claims or temporarily Allowed Claims in Class 5 (Other General Unsecured Claims).  As a result, there will be no Allowed Claims or temporarily Allowed Claims in Class 5 (Other General Unsecured Claims) as of the date of the Confirmation Hearing. Pursuant to Section 4.4 of the Plan, Class 5 (Other General Unsecured Claims) shall be deleted from the Plan.  Given the foregoing, there are no Ballots to be tabulated in Class 5 (General Unsecured Claims).[4] A summary of the voting results is included below:

| **Class** | **Percentage of Voting Number Accepting** | **Percentage of Voting Clam Value Accepting** | **Percentage of Voting Number Rejecting** | **Percentage of Voting Claim Amount Rejecting** | **Result** |
|---|---|---|---|---|---|
| Class 2 (Secured Lender Claims) | 100% | 100% | 0% | 0% | Accept |
| Class 3 (REILS Claims) | 100% | 100% | 0% | 0% | Accept |
| Class 4 (General Unsecured Claims) | 100% | 100% | 0% | 0% | Accept |
| Class 5 (Other General Unsecured Claims) | N/A | N/A | N/A | N/A | N/A |

30.     The Debtor refers the Court to the Plan, the Disclosure Statement, the Solicitation Procedures, the Plan Supplement, the Supporting Declarations, and the record of the Chapter 11

---

[4] Class 5 (Other General Unsecured Claims) contained no Holders of Claims and will be deleted from the Plan in accordance with section 4.4 thereof.

Case for an overview of the Debtor's business, operations, and any other relevant facts bearing on approval of the Disclosure Statement and Confirmation of the Plan. Any testimony and other declarations proffered or submitted in connection with the Combined Hearing are fully incorporated herein.

## ARGUMENT

31.     This brief is divided into two parts. ***First***, the Debtor requests final approval of the Disclosure Statement. ***Second***, the Debtor demonstrates that the Plan satisfies the confirmation requirements of Section 1129 of the Bankruptcy Code, and, accordingly, requests that the Court confirm the Plan.

## I.     The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtor Satisfied the Applicable Notice Requirements

### A.     The Disclosure Statement Contains Adequate Information

32.     The primary purpose of a disclosure statement is to provide material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[5] "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[6] Courts within the Fifth Circuit and elsewhere acknowledge that bankruptcy courts have broad discretion in determining what constitutes "adequate information" for the purpose of satisfying Section 1125 of the Bankruptcy Code.[7]

33.     Courts generally look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

- the events that led to the filing of a bankruptcy petition;

---

[5] *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988).
[6] *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 400 (Bankr. S.D. Tex. 2016).
[7] *See, e.g.*, *In re Tex. Extrusion*, 844 F.2d at 1157.

- the relationship of the debtors with their affiliates;

- a description of the available assets and their value;

- the anticipated future of the companies;

- the source of information stated in the disclosure statement;

- the present condition of the debtors while in chapter 11;

- claims asserted against the debtors;

- the estimated return to creditors under a chapter 7 liquidation;

- the chapter 11 plan or a summary thereof;

- financial information, valuations, and projections relevant to the creditors'

- decision to accept or reject the chapter 11 plan;

- information relevant to risks posed to creditors under the plan;

- the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;

- litigation likely to arise in a non-bankruptcy context; and

- tax attributes of the debtors.[8]

34.    The Disclosure Statement contains adequate information and was previously approved on a conditional basis on October 31, 2025 pursuant to the Solicitation Procedures Order. The Disclosure Statement contains descriptions and summaries of, among other things: (a) the Plan, (b) the Debtor's business operations, (c) key events leading to the commencement of the chapter 11 case, (d) the Debtor's prepetition indebtedness, (e) financial information and valuations

---

[8] *See In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996) (citing *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)); *see also In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing factors that courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (setting forth a non-exhaustive list of 19 categories of information that may be included in a disclosure statement). Disclosure regarding all of the aforementioned topics is not necessary in every case. *See In re U.S. Brass*, 194 B.R. at 425; *see also In re Phoenix Petroleum*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

that would be relevant to creditors' determination to accept or reject the Plan, including projected recoveries, (f) description of the material terms of the Sale Transaction, (g) a liquidation analysis setting forth the estimated return that Holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation (as set forth in the Plan Supplement), (h) securities disclosures with respect to the Plan, (i) risk factors associated with the Plan, and (j) federal tax law consequences of the Plan.

35.     Accordingly, the Debtor submits that the Disclosure Statement served in accordance with the Solicitation Procedures Order contains sufficient information necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations. Moreover, the Disclosure Statement contains "adequate information" (as such term is defined in Section 1125(a) of the Bankruptcy Code and used in Section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtor, the Plan, and the distributions and transactions contemplated by the Plan, and should be approved.

**B.    The Debtor Complied with the Applicable Notice Requirements**

36.     In addition to conditionally approving the adequacy of the Disclosure Statement, the Solicitation Procedures Order granted final relief regarding solicitation and noticing procedures and materials including, among other things: (a) approving the Solicitation Procedures; (b) approving the form and manner of the Combined Hearing Notice; and (c) approving certain dates and deadlines with respect to the Plan and Disclosure Statement. The Debtor complied with the procedures and timeline approved by the Solicitation Procedures Order.

**C.    The Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith**

37.     Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions

of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[9] As set forth in the Disclosure Statement, and as demonstrated by the Debtor's compliance with the Solicitation Procedures and Solicitation Procedures Order,[10] the Debtor at all times engaged in arm's-length, good faith negotiations and took appropriate actions in connection with the solicitation of the Plan in compliance with Section 1125 of the Bankruptcy Code. Therefore, the Debtor requests that the Court grant the parties the protections provided under Section 1125(e) of the Bankruptcy Code.

## II.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code

### A.    Section 1129(a)(1): Plan Compliance with Bankruptcy Code Provisions

#### 1.    The Plan Complies with Section 1122 of the Bankruptcy Code

38.    The Plan's classification of Claims and Interests complies with Section 1122(a) of the Bankruptcy Code, which states that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[11] Substantial similarity, however, does not require that claims or interests in a particular class be identical, or that all similarly situated claims or interests must receive the same plan treatment.[12] Courts afford a plan proponent with "significant flexibility" in classifying claims and interests under Section 1122(a), provided that there is a reasonable basis for the classification scheme and all claims or interests within a particular class are substantially similar.[13]

---

[9] 11 U.S.C. § 1125(e).

[10] *See* Solicitation Affidavit.

[11] 11 U.S.C. § 1122(a).

[12] *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that "[section] 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar claims may be separately classified"); *see also In re Vitro Asset Corp.*, 2013 WL 6044453, at *5 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class").

[13] *See In re Pisces Energy LLC*, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("Significantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."); *see also In re Mirant Corp.*, 2005 WL 6443614, at *19 (Bankr. N.D. Tex. Dec. 9, 2005); *In*

39.     The Plan provides for the following six Classes of Claims and Interests: Class 1 (Other Priority Claims); Class 2 (Secured Lender Claims); Class 3 (REILS Claims); Class 4 (General Unsecured Claims); Class 5 (Other General Unsecured Claims);[14] and Class 6 (Existing Equity Interests).[15]

- *Class 1 (Other Priority Claims)*. Class 1 comprises every Claim against the Debtor accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim, DIP Claim, or Priority Tax Claim.

- *Class 2 (Secured Lender Claims)*. Class 2 comprises the Secured Claim of the Secured Lender set forth in Proof of Claim No. 10.

- *Class 3 (REILS Claims)*. Class 3 comprises any and all Claims arising from the Debtor Guaranty.

- *Class 4 (General Unsecured Claims)*. Class 4 comprises all Claims against the Debtor, held by a creditor that furnished goods or services to the Debtor and excluding any Administrative Claims, DIP Claims, Professional Fee Claims, U.S. Trustee Fees, Priority Tax Claims, Other Priority Claims, or REILS Claim as of the Petition Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Court.

- *Class 5 (Other General Unsecured Claims)*. Class 5 comprises any unsecured claim against the Debtor that is not a General Unsecured Claim.[16]

- *Class 6 (Existing Equity Interests)*. Class 6 comprises all existing equity Interests in the Debtor as of the Petition Date.

40.     The classification structure of the Plan is rational and appropriate because all Claims and Interests within a Class have the same or similar rights against the Debtor. Valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or

---

*re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar.").

[14] Per Section 4.4 of the Plan, Class 5 shall be deleted.

[15] Administrative Expense Claims, DIP Claims, and Priority Tax Claims have not been classified and are separately treated under the Plan.

[16] Per Section 4.4 of the Plan, Class 5 shall be deleted.

among Holders of Claims and Interests. The Plan provides for separate classification of Claims and Interests, which classification generally tracks the Debtor's prepetition capital structure and debt obligations, and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests:

> **2.     The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a)(1)–(7) of the Bankruptcy Code**

41.     Section 1123 of the Bankruptcy Code sets forth both mandatory and optional provisions that a chapter 11 plan must and may include. For the reasons set forth below, the Plan (a) satisfies each of the mandatory requirements of Section 1123(a) of the Bankruptcy Code; (b) includes several of the optional provisions permitted under Section 1123(b) of the Bankruptcy Code; and (c) includes other provisions not inconsistent with other applicable provisions of the Bankruptcy Code within the meaning of Section 1123(b)(6) of the Bankruptcy Code.

> **a.     The Plan Properly Describes Each Class of Claims and Its Treatment (Section 1123(a)(1)–(3))**

42.     Article III of the Plan properly designates Classes of Claims and Interests.  The Plan also identifies Class 1 as Unimpaired within the meaning of the Bankruptcy Code, and sets forth the treatment of each Impaired Class, including Class 6 which is Impaired and not entitled to vote on the Plan.

> **b.     The Plan Provides the Same Treatment Within Each Class (Section 1123(a)(4))**

43.     Section 3.3 of the Plan provides that, except as otherwise agreed to by a Holder of a particular Claim or Interest, all members of any given Class are receiving the same treatment on account of their Claims and Interests.

### c.  The Plan Provides Adequate Means for Its Implementation (Section 1123(a)(5))

44.     Article V and various other provisions of the Plan provide adequate means for the Plan's implementation, which satisfy the requirements of Section 1123(a)(5) of the Bankruptcy Code.[17] The provisions of Article V of the Plan relate to, among other things: (1) the appointment of the Plan Administrator; (2) the establishment of the Wind Down Reserve; (3) the consummation of the Restructuring Transactions; (4) the Sale Transaction; (5) the settlement and release of various claims; and (5) the cancellation of various securities and agreements.

45.     Accordingly, the Plan, together with the documents set forth in the Plan Supplement, provide the means for implementing the Plan as required by Section 1123(a)(5) of the Bankruptcy Code.

### d.  The Plan Does Not Create Nonvoting Equity Securities (Section 1123(a)(6))

46.     The Plan does not create any nonvoting equity securities so it complies with Section 1123(a)(6) of the Bankruptcy Code.

### e.  The Plan's Provisions for Selecting Directors and Officers Are Consistent with Stakeholders' Interests and Public Policy (Section 1123(a)(7))

47.     There will be no officers or directors of the Debtor following the Effective Date. Instead, the Plan specifies that the Plan Administrator shall act as the Debtor's sole officer,

---

[17] *See* 11 U.S.C. § 1123(a)(5). Section 1123(a)(5) requires a plan to provide for "adequate means" for the plan's implementation, "such as— (A) retention by the debtor of all or any part of the property of the estate; (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after confirmation of such plan; (C) merger or consolidation of the debtor with one or more persons; (D) sale of all or any part of property of the estate … among those having an interest in such property of the estate; (E) satisfaction or modification of any lien; (F) cancellation or modification of any indenture or similar instrument; (G) curing or waiving of any default; (H) extension of a maturity date or change in an interest rate or other term of outstanding securities; (I) amendment of the debtor's charter; or (J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose."

director, and manager, as applicable, with respect to the Debtor's affairs. Therefore, the Plan satisfies Section 1123(a)(7).

### 3. The Plan's Discretionary Contents Comply with Section 1123(b) of the Bankruptcy Code

48. Section 1123(b)(6) of the Bankruptcy Code also authorizes the inclusion of "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code.]" 11 U.S.C. § 1123(a)(6). The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1123(b)(6) of the Bankruptcy Code, including, without limitation, (a) various terms discharging, releasing, and enjoining the pursuit of Claims, and (b) a consensual Third-Party Release of certain potential Claims.

### a. The Debtor's Releases are Appropriate, in the Bests Interest of the Debtor's Constituents, and Should be Approved

49. The release and exculpation provisions result from extensive good faith and arm's-length negotiations by and among the Debtor[18] and the Released Parties.[19] Such provisions are consistent with applicable case law and precedent in this district, comply with the Bankruptcy Code in all respects, and should be approved in all respects as integral components of the Plan.

50. The Debtor's releases of certain parties from Claims and Causes of Action in Section 10.4(a) of the Plan (the "***Debtor Releases***") are appropriate, justified, in the best interests of the stakeholders, and an integral part of the Plan. The Debtor has proposed the Debtor Releases based on its sound business judgment.

---

[18] The Debtor is the only Exculpated Party under the Plan.
[19] Pursuant to Article I.A.84 of the Plan, the term "***Released Party***" means each of the following, solely in its capacity as such: (a) the Debtor, (b) Plan Sponsor, (c) NCP Parties, (d) the Secured Lender, and (e) with respect to each of the foregoing in clauses (a)–(d), each of their Related Parties.

51.     Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may include "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[20] In considering the appropriateness of such settlements, courts in the Fifth Circuit generally examine whether the release is "fair, equitable and in the best interests of the estate."[21] The "fair and equitable standard" incorporates the absolute priority rule.[22] Courts in the Fifth Circuit generally weigh the following factors in determining whether a settlement is in the best interests of the estate: (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection; (c) the paramount interest of the creditors and a proper deference to their respective views; (d) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (e) all other factors bearing on the wisdom of the compromise.[23]

52.     In determining whether a settlement is appropriate and should be approved, "a bankruptcy court need not 'conduct a mini-trial' [but] [r]ather . . . must 'apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision.'"[24] Although the debtor bears the burden of establishing that a settlement is fair and equitable based on a balance of

---

[20] *See* § 1123(b)(3)(A); *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan").

[21] *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson*, 390 U.S. 414, 424–25 (1968)); *In re Bigler*, 442 B.R. at 543 n.6; *In re Derosa-Grund*, 567 B.R. 773, 784–85 (Bankr. S.D. Tex. 2017).

[22] *See In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 355–56 (5th Cir. 1997) ("'The words 'fair and equitable' are terms of art—they mean that senior interests are entitled to full priority over junior ones.'" (quotation omitted)); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006) ("'fair and equitable' translates to the absolute priority rule").

[23] *See In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010); *In re Foster Mortg. Corp.*, 68 F.3d 914, 917–18 (5th Cir. 1995); *In re Roqumore*, 393 B.R. 474, 479–80 (Bankr. S.D. Tex. 2008).

[24] *In re Age Refining, Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (quotation omitted).

the above factors, "the [debtor's] burden is not high."[25] Indeed, the court "need only determine

that the settlement does not 'fall beneath the lowest point in the range of reasonableness.'"[26]

53.     Based on the Debtor's analysis, the Debtor Releases benefit the Debtor's Estate,

and the probability of success in litigation with respect to claims the Debtor may have against each

of the Released Parties, if any, is outweighed by the value of the contributions of the Released

Parties to the Debtor's overall restructuring. The Debtor Releases are the result of a hard fought

and arm's-length negotiation process conducted in good faith.

54.     Each of the Released Parties made significant concessions and contributions to the

Chapter 11 Case. The Debtor's Released Parties supported the Plan and the Chapter 11 Case,

actively participated in meetings, hearings, and negotiations during the Chapter 11 Case, and have

provided other valuable consideration to the Debtor. Thus, the Debtor Releases are a component

of the consensual Plan process, and no constructive purpose would be served by preserving or

seeking to prosecute any of the Claims, Causes of Action, or liabilities against the Released Parties

that are released under the Plan.

55.     There is ample justification for providing the Debtor Releases. Accordingly, the

Debtor Releases are fair, equitable, and in the best interest of the Debtor.

> **b.      The Third-Party Releases are Consensual, Appropriate, and Comply
> with the Bankruptcy Code**

56.     Section 10.4(b) of the Plan for the release of Claims or Causes of Action by the

Releasing Parties against the Released Parties (the "***Third Party Releases***"). The sale and

restructuring contemplated by the Plan would not be possible absent the support of the Released

---

[25] *See Roqumore*, 393 B.R. at 480.

[26] *In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009) (quotation omitted); *In re Allied Props., LLC*, 2007 WL 1849017, at *4–5 (Bankr. S.D. Tex. June 25, 2007) ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'" (quotation omitted)).

Parties. Thus, the Third-Party Releases operate to augment the recovery to creditors by facilitating a value-maximizing transaction.

57.     Although the Fifth Circuit has not directly defined what constitutes a consensual third-party release, the District Court for the Southern District of Texas has affirmed this Court's holding that a claimant who received notice of the debtor's chapter 11 filing and the proposed plan, which included a third-party release, but failed to object to the plan, was deemed to have consented to the third-party release.[27] The Fifth Circuit has also shed light on the issue through a series of decisions addressing the *res judicata* effect of a confirmed chapter 11 plan that contains a third-party release provision, holding that the Bankruptcy Code does not preclude a third-party release provision where "it has been accepted and confirmed as an integral part of a plan of reorganization."[28]

58.     The Third-Party Releases are consensual as they are being granted only by (a) the Debtor, (b) the Plan Sponsor, (c) the NCP Parties, (d) the Secured Lender, (e) the DIP Lender, and (f) Holders of Claims that accept the Plan.

59.     The Third-Party Releases are an integral part of the Plan and a condition of the agreements set forth therein. The Third-Party Releases facilitated participation in both the Plan by the Released Parties and the chapter 11 process and were critical in reaching consensus to support the Plan and the Sale Transaction contemplated therein. The Released Parties have played an extensive and integral role in the Chapter 11 Case and in the Debtor's proposed restructuring. All

---

[27] *See, e.g., In re CJ Holding Co.*, 597 B.R. 597, 609 (S.D. Tex. 2019) (holding that a claimant who failed to object to confirmation of the plan consented to the plan and the third-party releases contained therein).

[28] *See Republic Supply Co.* v. *Shoaf*, 815 F.2d 1046, 1050, 1053 (5th Cir. 1987); *see also FOM Puerto Rico S.E.* v. *Dr. Barnes EyeCenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (approving a third-party release that was "an integral part of the Plan and [was] specific enough to satisfy the standard in *Shoaf*").

parties in interest benefit from the Restructuring Transactions contemplated by the Plan and the significant contributions of the Released Parties in furtherance thereof.

60.     Accordingly, the Third-Party Releases are consensual, fair, equitable, and in the best interest of the Debtor.

### c.     The Plan's Exculpation Provision Is Appropriate

61.     Section 10.3 of the Plan provides that the Exculpated Party[29] shall be exculpated from any liability arising in connection with the Chapter 11 Case and related postpetition distributions (the "***Exculpation***"). The Exculpation carves out acts or omissions that are determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence. Unlike the Third-Party Release, the Exculpation does not affect the liability of third parties *per se*, but rather sets a standard of care of gross negligence, fraud, or willful misconduct in hypothetical future litigation against an exculpated party for acts arising out of the Debtor's restructuring.[30] A bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan as a chapter 11 plan cannot be confirmed unless the bankruptcy court finds that the plan has been proposed in good faith.[31] Thus, an exculpation provision represents a legal determination that flows from several different findings a bankruptcy court must reach in confirming a plan, as well as the statutory exculpation in Section 1125(e) of the Bankruptcy Code.[32] Once the court makes a good faith finding, it is appropriate to set the standard of care of the parties involved in the formulation of that chapter 11 plan.[33] The Exculpation, therefore, properly prevents future

---

[29] Pursuant to the Plan, the "Exculpated Party" is the Debtor.

[30] *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code").

[31] *See* 11 U.S.C. § 1129(a)(3).

[32] *See id.* § 157(b)(2)(L).

[33] *See PWS*, 228 F.3d at 246–247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties").

collateral attacks against estate fiduciaries and others that participate actively in the Debtor's restructuring.

62.     Further, the Plan does not include ineligible parties within the definition of "Exculpated Party" and otherwise complies with the precedent set by the Fifth Circuit in *In re Highland Capital Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022). Specifically, in *Highland*, the court expressly adopted and applied Fifth Circuit precedent providing qualified immunity to "bankruptcy trustees," which extends to a debtor in possession under Section 1107 of the Bankruptcy Code.[34] Case law in this circuit and others is clear that where a bankruptcy trustee is not appointed, a debtor in possession's Court-appointed directors and officers are considered fiduciaries both to the debtor in possession and to the creditors, just as a trustee would be if one were appointed.[35] The Plan therefore properly includes the Debtor within the scope of the Exculpation for postpetition actions taken prior to the Effective Date.

63.     The Exculpated Party (the Debtor) participated in good faith in formulating and negotiating the Plan, and should be entitled to protection from exposure to any lawsuits related to the Debtor's restructuring. The Debtor engaged in extensive, hard-fought negotiations with the key constituencies in these Chapter 11 Case. To that end, the Exculpated Party played a key role in the developing the Plan.

---

[34] *In re Highland Capital Mgmt., L.P.*, 48 F.4th 419, 437–38 (5th Cir. 2022).
[35] *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[I]f a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession."); *see also In re Foster*, 2023 WL 20872, at *5 n.25 (5th Cir. Jan. 3, 2023) ("[A]s a matter of law, counsel for trustee, court appointed officers who represent the estate, are the functional equivalent of a trustee, where . . . they act at the direction of the trustee and for the purpose of administering the estate or protecting its assets" (quotation omitted)); *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("[A]n arm of the Court [who] sought and obtained court approval of his actions . . . is entitled to derived immunity."); *In re Voyager Digital Holdings, Inc.*, 2023 WL 2731737, at *9 (S.D.N.Y. Apr. 1, 2023) (noting that in addition to trustees and debtors-in-possession, judicial immunity extends to "court appointed officers who represent the estate" (quotation omitted)).

64.    Ultimately, the Exculpation set forth in Article IX.D of the Plan is essential to the Plan, appropriate under applicable law, including *Highland*, and constitutes a proper exercise of the Debtor's business judgment. The Exculpation was proposed in good faith; was formulated following extensive, good faith, arm's-length negotiations with key constituents; and is appropriately limited in scope to achieve the overall purpose of the Plan. For these reasons, the Exculpation should be approved by the Court.

### d.    The Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained in the Plan

65.    Section 10.2 of the Plan sets forth the Plan's injunction provisions (the "***Injunction***"). The Injunction is the necessary enforcement mechanism for the release and exculpation provisions of the Plan. As a key component of the Debtor's restructuring, the Injunction is necessary to preserve and enforce the Debtor Releases, the Third-Party Releases, and the Exculpation, and is narrowly tailored to achieve that purpose. Based on the foregoing, the Injunction is fair, equitable, and in the best interest of the Debtor and its Estate and should be approved by the Court.

### e.    Assumption and Rejection of Executory Contracts and Unexpired Leases (Section 1123(b)(2))

66.    Section 1123(b)(2) allows for the assumption and rejection of executory contracts and unexpired leases by a plan. Article VIII of the Plan provides for the rejection of the Debtor's Executory Contracts and Unexpired Leases as of the Effective Date unless such Executory Contract or Unexpired Lease (i) has previously been assumed or assumed and assigned by order of the Court in effect prior to the Effective Date (which order may be the Confirmation Order); (ii) is the subject of a motion to assume filed on or before the Effective Date; (iii) is identified on the Schedule of Assumed Executory Contracts or Unexpired Leases; or (iv) has expired or terminated pursuant to its own terms.

67.     The Debtor properly exercised sound business judgment in determining which executory contracts and unexpired leases to assume and to reject.

**B.      Section 1129(a)(2): Debtor's Compliance with the Bankruptcy Code**

68.     The principal purpose of Section 1129(a)(2) of the Bankruptcy Code, as reflected in its legislative history, is to ensure that a plan proponent has complied with Sections 1125 (postpetition disclosure and solicitation) and 1126 (acceptance of the plan) of the Bankruptcy Code.[36]

**1.      Section 1125: Post-Petition Disclosure Statement and Solicitation**

69.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). Following the Court's entry of the Solicitation Procedures Order, the Debtor solicited votes on the Plan consistent with the Court-approved Solicitation Procedures.[37] The Debtor did not solicit acceptances of the Plan from any holder of a Claim or Interest before entry of the Solicitation Procedures Order, thus complying with Section 1125(b) of the Bankruptcy Code.

**2.      Section 1126: Acceptance of the Plan**

70.     Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a plan and determining acceptance thereof. Pursuant to Section 1126 of the Bankruptcy Code, only holders of allowed claims or equity interests in impaired classes of claims or equity interests

---

[36] *See* 11 U.S.C. § 1129(a)(2); H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").
[37] *See generally* Solicitation Affidavit.

that will receive or retain property under a plan on account of such claims or equity interests may

vote to accept or reject such plan. *See* 11 U.S.C. §§ 1126(a), (f), and (g). As set forth above, the

Debtor solicited acceptances of the Plan only from the Holders of Claims in the Voting Classes,

which are the only Classes that are Impaired and entitled to vote on the Plan.[38] The Debtor did not

solicit votes to accept or reject the Plan from the Holders of Claims and Interests in the Non-Voting

Classes, all of which are either (a) Unimpaired and, therefore, presumed to have accepted the Plan

pursuant to Section 1126(f) of the Bankruptcy Code, or (b) deemed to have rejected the Plan

pursuant to Section 1126(g) of the Bankruptcy Code.

71.     Sections 1126(c) and (d) of the Bankruptcy Code specify that holders of an

impaired class of claims or interests must vote in favor of a plan by at least two-thirds in amount

and more than one-half in number of the allowed claims, or interests, of such class to accept the

plan. *See* 11 U.S.C. § 1126(c), (d). As set forth in the Voting Declaration, the requisite number of

Holders of Claims voting the requisite amount of Claims in each of the Voting Classes voted to

accept the Plan. Based on the foregoing, the requirements of Sections 1125 and 1126 of the

Bankruptcy Code have been satisfied, and thus, the Debtor has satisfied the requirements of

Section 1129(a)(2) of the Bankruptcy Code.

**C.      Section 1129(a)(3): Good Faith**

72.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in

good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Good faith is generally

interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result

consistent with the objectives and purposes of the Bankruptcy Code.[39] The good faith standard is

"viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan,

---

[38] *See* Solicitation Affidavit.
[39] *See In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start."[40]

73.     The Plan has been proposed by the Debtor in good faith and for the legitimate and honest purposes of maximizing recoveries to the Debtor's stakeholders in accordance with the requirements of the Bankruptcy Code. The Plan is the culmination of extensive, good-faith negotiations, and even mediation, among the Debtor and the Debtor's key economic stakeholders, including the Secured Lender, the Plan Sponsor, CLS, NCP Parties, and REILS. The Debtor has been in direct communication with each of the foregoing throughout this Chapter 11 Case. The Plan provides the best available path towards maximizing value and recoveries for the benefit of the various claimants and other interested parties.

74.     Furthermore, the Plan is "not by any means forbidden by law," and indeed, is in full compliance with the Bankruptcy Code and applicable nonbankruptcy law. Accordingly, the Debtor has proposed the Plan in good faith in compliance with Section 1129(a)(3) of the Bankruptcy Code.

### D.     Section 1129(a)(4): Professional Fees Subject to Court Approval

75.     Section 1129(a)(4) of the Bankruptcy Code requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."[41] Section 1129(a)(4) has been construed to require that all payments of estate professional fees that are made from estate assets be subject to review

---

[40] *In re Sun Country Dev., Inc*., 764 F.2d 406, 408 (5th Cir. 1985); *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) ("Good faith should be evaluated 'in light of the totality of the circumstances' . . . mindful of the purposes underlying the Bankruptcy Code." (quotation omitted)); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997).
[41] 11 U.S.C. § 1129(a)(4).

and approval as to their reasonableness by the court.[42] As to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[43]

76.      All payments by the Debtor for services provided to the Debtor during the Chapter 11 Case will be, subject to approval by the Court, reasonable in accordance with Section 1129(a)(4) of the Bankruptcy Code. In regards to post-Effective Date fees, the Plan Administrator will review monthly fee submissions and, as the circumstances would warrant, work through or discuss questions with such professional before any fee payments were made.

77.      Section 2.4 of the Plan provides that Professionals seeking approval of compensation for services rendered or reimbursement of expenses incurred through the Effective Date must file final applications by the Professional Fee Claims Bar Date, thereby giving interested parties adequate time to review the Professional Fee Claims. Further, Section 11.1 of the Plan provides that the Court "shall retain jurisdiction (unless otherwise indicated) over all matters arising in, arising out of, and/or related to, the Chapter 11 Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to: . . . hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses by the Plan Administrator, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the [Court]."

---

[42] *See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 517–18 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."); *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan can be confirmed, "there must be a provision for review by the Court of any professional compensation").

[43] *In re Cajun Elec. Power*, 150 F.3d at 517.

E.        **Section 1129(a)(5): Information Regarding Proposed Officers and Managers**

78.       The Bankruptcy Code requires a plan proponent to disclose the identities and affiliations of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor after confirmation of the plan. 11 U.S.C. § 1129(a)(5)(A)(i). Section 1129(a)(5)(A)(ii) of the Bankruptcy Code further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy. *Id.*

79.       The Plan Administrator shall act as the Debtor's sole officer, director, and manager, as applicable as of the Effective Date.

80.       Additionally, Section 1129(a)(5)(B) requires that a plan proponent disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider. 11 U.S.C. § 1129(a)(5)(B). No managers who are insiders are contemplated to be employed or retained directly by the Debtor. Accordingly, the Plan fully complies with, and satisfies, the requirement of Section 1129(a)(5) of the Bankruptcy Code.

F.        **Section 1129(a)(6): Inapplicable Provision**

81.       Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. No such rate changes are provided for in the Plan, which renders Section 1129(a)(6) inapplicable.

G.        **Section 1129(a)(7): Treatment of Holders of Impaired Classes**

82.       The Plan is in the best interests of creditors thus satisfying Section 1129(a)(7). Section 1129(a)(7) of the Bankruptcy Code—the "best interests of creditors" test—requires that with respect to each impaired class of claims or interests, either: (a) each holder of a claim or

interest of such class has accepted the plan; or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code.[44] The best interests test applies if a claim or interest entitled to vote does not vote to accept a plan, even if the class as a whole votes to accept the plan.[45] Generally, the best interests test is satisfied by a liquidation analysis demonstrating that an impaired class will receive no less under the plan than under a chapter 7 liquidation.[46]

83.     As set forth in the Liquidation Analysis provided in the Plan Supplement and as discussed in the White Declaration, each holder of a Claim or Interest in an impaired Class will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive if the Debtor was liquidated under chapter 7.

**H.     Section 1129(a)(8): Acceptance by Each Impaired Class of Claims or Interests**

84.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept a plan or be unimpaired under a plan. *See* 11 U.S.C. § 1129(a)(8). A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in the number of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan. *See* 11 U.S.C. § 1126(c). A class that is not

---

[44] 11 U.S.C. § 1129(a)(7)(A).

[45] *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *see, e.g.*, *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

[46] *See In re Adelphia Commc'ns. Corp.*, 361 B.R. 337, 366-67 (S.D.N.Y. 2007); *see also In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2007) ("In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions.").

impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan. *See* 11 U.S.C. § 1126(f).

85.     Classes 2, 3 and 4 have voted to accept the Plan.  Class 1 is unimpaired and presumed to accept the Plan. Class 6 is impaired and deemed to reject the Plan. Class 5 shall be deleted from the Plan as detailed above.

86.     Notwithstanding the deemed rejection by Class 6, as set forth below, the requirements of Section 1129(b) are satisfied as to each such Class.

87.     Accordingly, the Plan satisfies Section 1129(a)(8) of the Bankruptcy Code with respect to all of the foregoing Classes.

I.     **Section 1129(a)(9): Payment of Priority Claims**

88.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the Holders of certain other priority claims receive deferred cash payments. *See* 11 U.S.C. § 1129(a)(9). In particular, pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, Holders of claims of a kind specified in Section 507(a)(2) of the Bankruptcy Code—administrative expenses allowed under Section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.

89.     The Plan states that unless otherwise agreed by a Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Priority Tax Claims either (a) payment in full in Cash, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim becomes payable under applicable non-bankruptcy law, (b) payment upon such other terms as agreed between the Plan

Sponsor and each Holder of such Allowed Priority Tax Claim, or (c) installment payments in Cash over a period ending not later than five (5) years after the Petition Date consistent with section 1129(a)(9)(C) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

**J.**     **Section 1129(a)(10): Acceptance by Impaired Classes**

90.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider." At least one impaired Class of Claims entitled to vote on the Plan has accepted the Plan. Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.**     **Section 1129(a)(11): Feasibility**

91.     The Plan is feasible and not likely to be followed by the need for further financial reorganization. Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . , unless such liquidation or reorganization is proposed in the plan."[47]

92.     The feasibility inquiry is fact intensive and requires a case-by-case analysis, but has a relatively low threshold of proof necessary to satisfy the feasibility requirement.[48] "Where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible. . . . Debtors are not required to view business and economic prospects in the worst possible light."[49] In this Circuit,

---

[47] *See* 11 U.S.C. § 1129(a)(11).
[48] *See id.*; *see also Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) ("[A] 'relatively low threshold of proof' will satisfy the feasibility requirement." (quoting *In re Brotby*, 303 B.R. 177, 191–92 (B.A.P. 9th Cir. 2003))).
[49] *In re T-H New Orleans LP*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *In re Lakeside Global II, Ltd.*, 116 B.R. 499,

courts have required a determination that the plan "has a reasonable likelihood of success" and "a reasonable assurance of commercial viability."[50]

93.     Here, the Plan facilitates the Sale Transaction to the Plan Sponsor, who is funding the various settlements and Wind Down Reserve (and through the Wind Down Reserve, is funding the Plan Administrator) under the Plan. The result of which is a fully consensual Plan, with the support of the Debtor's key stakeholders. Further, the Plan Funding will allow the Plan Administrator to make all payments called for under the Plan, including the payment of Administrative Expenses, statutory fees including payment of fees to the Office of the United States Trustee and distributions to Holders of Claims under the Plan.   Finally, the Plan Administrator shall be provided with sufficient funding to undertake the responsibilities set forth in the Plan Administrator Agreement and ultimately effect the wind down of the Debtor and closing of the Chapter 11 Case.   Accordingly, the Plan is feasible and meets the requirements of section 1129(a)(11) under Fifth Circuit law.

## L.     Section 1129(a)(12): Payment of U.S. Trustee Fees

94.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[51] Section 2.1 of the Plan provides that as with other Allowed Administrative Claims, unless the Holder of such an Allowed Administrative Claim agrees to less favorable treatment of such Claim, all fees payable under Section 1930 of chapter 123 of title 28

---

508 n.20 (Bankr. S.D. Tex. 1989)).

[50] *See In re Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1165–66 (5th Cir. 1993) ("As numerous courts have explained 'the court need not require a guarantee of success' . . . [and] '[o]nly a reasonable assurance of commercial viability is required'" to meet the feasibility test (quotation omitted)); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 801–02 (explaining that "[a]ll the bankruptcy court must find is that the plan offer 'a reasonable probability of success,'" and citing *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989) in explaining that even a liquidating chapter 11 plan does not violate Bankruptcy Code section 1129(a)(11)); *In re Cypresswood Land Partners, I*, 409 B.R. at 432–33; *see also In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 832–33 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan.").

[51] *See* 11 U.S.C. § 1129(a)(12).

of the United States Code shall be paid, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.

95.     Section 12.1 of the Plan further provides that all U.S. Trustee Fees payable after the Effective Date, if any, shall be paid by the Plan Administrator on behalf of the Debtor until the closing of the Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**M.     Section 1129(a)(13)–(16): Inapplicable Provisions**

96.     Section 1129(a)(13) of the Bankruptcy Code requires that chapter 11 plans continue all retiree benefits (as defined in Section 1114 of the Bankruptcy Code). The Debtor does not have any obligations to pay retiree benefits and, therefore, Section 1129(a)(13) is inapplicable. Sections 1129(a)(14) and (15) of the Bankruptcy Code apply only to debtors who are individuals and therefore do not apply here. Section 1129(a)(16) of the Bankruptcy Code applies only to debtors that are nonprofit entities or trusts and therefore does not apply here.

**N.     Section 1129(b): Cramdown of Non-Accepting Classes**

97.     Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims or interests, which is known informally as "cramdown." Section 1129(b) of the Bankruptcy Code provides, in pertinent part:

[I]f all of the applicable requirements of [Section 1129(a) of the Bankruptcy Code]

> other than [the requirement contained in Section 1129(a)(8)] are met with respect
> to a plan, the court, on request of the proponent of the plan, shall confirm the plan
> notwithstanding the requirements of such paragraph if the plan does not
> discriminate unfairly, and is fair and equitable, with respect to each class of claims
> or interests that is impaired under, and has not accepted, the plan.[52]

Under Section 1129(b) of the Bankruptcy Code, the court may "cram-down" a plan over the

dissenting vote of an impaired class or classes of claims or interests as long as the plan does not

"discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

By its express terms, Section 1129(b) of the Bankruptcy Code is only applicable to a class of

creditors or equity holders that rejects a plan.[53] Accordingly, a dissenting holder in an accepting

class lacks standing to object to the plan on the basis of unfair discrimination or absolute priority.[54]

98.     Pursuant to Section 1129(b) of the Bankruptcy Code, a plan may be confirmed

notwithstanding the rejection or deemed rejection by a class of claims or interests (i.e., "crammed

down") so long as the plan is "fair and equitable" and it does not discriminate unfairly as to the

non-accepting class. As detailed in the Voting Declaration, each Voting Class of Claims voted to

accept the Plan. Accordingly, the only Class to which cramdown is relevant is Class 6 (Existing

Equity Interests), who has been deemed to reject the Plan.

### 1.     The Plan Does Not Discriminate Unfairly

99.     The Bankruptcy Code does not provide a standard for determining "unfair

discrimination."[55] Courts instead examine the facts and circumstances of the particular case to

---

[52] *Id.* § 1129(b)(1).

[53] *See id.* § 1129(b) ("[T]he court . . . shall confirm the plan notwithstanding the requirements of [section 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan." (emphasis added)).

[54] *See Kane v. Johns-Manville*, 843 F.2d 636, 650 (2d Cir. 1988) (refusing to consider objection of dissenting creditor in accepting class because section 1129(b) did not need to be satisfied as to an accepting class); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1062 (3d Cir. 1987) (overruling cram-down objection because objecting party was a member of an accepting class and therefore section 1129(b)(1) afforded no protection to such party).

[55] *See In re Idearc Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009).

determine whether there is unfair discrimination.[56] The unfair discrimination requirement ensures that similarly situated creditors and interest holders do not receive materially different treatment under a proposed plan without a compelling justification.[57] The Plan does not provide for any discrimination, much less unfair discrimination, between classes of similarly situated claims.

100.     As discussed herein, the Debtor has a reasonable basis for separately classifying the Classes of Claims and Interests subject to Section 1129(b)(1) Bankruptcy Code because each Class holds different rights and entitlements under the governing agreements and/or applicable law. Further, the Plan does not skip over any Class of Claims or Interests or otherwise favor any Class of Claims or Interests at the expense of a higher or equivalent priority Class.

101.     Class 6 (Existing Equity Interests) is the only Class of Interests relating to Interests in the Debtor, and no other Class of Claims or Interests represents securities of comparable legal priority with such Interests. Therefore, Class 6 is properly classified as a separate Class.

### 2.      The Plan Is Fair and Equitable

102.     Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if under the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.[58] In other words, a plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan if it follows the "absolute priority"

---

[56] *See In re Kolton*, 1990 WL 87007, at *5 (Bankr. W.D. Tex. Apr. 4, 1990) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis" (quoting *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985))); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[57] *See In re Idearc*, 423 B.R. at 171 ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling *justifications* for doing so."); *see also In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

[58] *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

rule.[59] The absolute priority rule mandates that a junior class of claims or interests cannot receive a distribution under the plan unless senior classes are rendered unimpaired or give their consent.[60]

103.     Distributions by the Plan Administrator in accordance with the Plan will be made in the order of priority prescribed by the Plan.

104.     No Class junior to Class 6 (Existing Equity Interests) exists nor is being paid anything under the Plan. For these reasons the Plan does not discriminate unfairly and is fair and equitable.  As a result the Plan is in compliance with section 1129(b) of the Bankruptcy Code.

**O.     Section 1129(c): The Plan Is the Only Plan Currently on File**

105.     The Plan is the only operative Chapter 11 plan currently on file in the Chapter 11 Case.  Therefore the Court does not have to make a decision as to whether approval of another competing plan is in the best interest of the Debtor's Estate and creditors.

**P.     Section 1129(d): The Principal Purpose of the Plan Is Not Avoidance of Taxes**

106.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of Section 5 of the Securities Act, and no governmental unit has objected on any such grounds. The Plan, therefore, satisfies the requirements of Section 1129(d) of the Bankruptcy Code.

**Q.     Section 1129(e): Inapplicable Provision**

107.     The provisions of Section 1129(e) of the Bankruptcy Code apply only to a "small business case." The Chapter 11 Case is not a "small business case," and accordingly, Section 1129(e) of the Bankruptcy Code has no application to the Plan.

---

[59] *See id.* § 1129(b); *Bank of Am. Nat'l Tr. & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999).
[60] 11 U.S.C. § 1129(b).

## <u>CONCLUSION</u>

For all of the reasons set forth herein, the Debtor respectfully requests that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Confirmation Order, overrule any remaining objections, and grant such other and further relief as may be appropriate under the circumstances.

Dated: December 4, 2025

      Houston, Texas

**REED SMITH LLP**

By: _/s/ Omar J. Alaniz_
Omar J. Alaniz (SBN 24040402)
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
E-mail: oalaniz@reedsmith.com

- and -

Scott M. Esterbrook (admitted *pro hac vice*)
Derek M. Osei-Bonsu (admitted *pro hac vice*)
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420

*Counsel for the*
*Debtor and Debtor-in-Possession*